[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal taken by plaintiff South Farms Associates Limited Partnership and pursued on amended appeal by Martin W. Hoffman, its Trustee in Bankruptcy, from the assessment of damages in the amount of $433,500 deposited with the clerk of court for the total taking of its property by eminent domain on September 28, 1989, pursuant to General Statutes }}13a-73 (b) and 13b-23. The deposit has been paid to the mortgagee on account of the mortgage indebtedness.
The premises taken are situated in the Town of Newington, westerly of Kimberley Road, and contain 29.9 acres, more or less, together with all appurtenances, all of which more particularly appears on a map entitled: "Town of Newington, Map Showing Land Acquired From South Farms Associates Limited Partnership by The State of Connecticut, Central Connecticut Expressway, Scale 1" = 80', July 1989, Robert W. Gubala, Transportation Chief Engineer — Bureau of Highways." Said acreage was taken together with an easement to pass and repass over lands of Ginsburg Properties Group, Inc., and McDonald's Corporation situated in the Towns of Newington, New Britain and Farmington.
The subject property is an irregularly shaped parcel of vacant land located on the west side rear of Kimberley Road in Newington and the east side rear of Route 71 in Farmington and New Britain. An easement 51 feet hide, more or less, over lands of Ginsburg and McDonald's provides access to Route 71. The site has open and wooded sections with low rolling topography. About two-thirds of the acreage, about 20 acres, is located in an inland wetlands area, and the remainder, about 10 acres, consists of uplands.
This condemnation was a delayed proceeding ancillary to the construction of that portion of the Central Connecticut Expressway designated as the Iwo Jima Memorial Expressway. See Special Act No. 89-51, 1. The Central Connecticut Expressway (CCE) project was subject to the provisions of the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq. Permits under the CWA may be conditioned on "mitigation" to avoid or reduce the adverse effects of a proposed project. Permit applicants may be required to compensate for wetlands to be destroyed by permitted activities. This form CT Page 11685 of mitigation is called "compensatory mitigation," which is defined at40 C.F.R. § 1508.20
(e) to mean "compensating for the impact by replacing or providing substitute resources or environments."
On June 21, 1989, James F. Sullivan, Deputy Commissioner, Bureau of Planning, Connecticut Department of Transportation, met with Lt. Colonel Stanley J. Murphy, U.S. Army, District Engineer, to discuss the defendant's proposal for mitigation for the CCE project. The proposal presented involved the "purchase of some 50-60 acres of wetland and upland acreage directly adjacent to property in DOT ownership along the proposed alignment." The substance of this meeting was confirmed by letter of June 23, 1989, from Murphy to Sullivan.
In this confirmation reference was made to the subject property as follows: "You noted that a particular private property with a proposed development involving wetlands fill would be affected by the DOT's intent to purchase adjacent property for mitigation. Based on information provided by you and Mr. Hurle, the proposal involves a hotel/office complex which would require wetlands fill to access the upland portions of the property to construct the proposed facilities on the property. The wetlands involved are contiguous with the aquatic system identified as site wetlands in the DOT's pending CCE permit application.
"At this time, the Corps has no record of a pending application on the subject proposed development without benefit of the proposal before us, the Corps cannot make judgment on the project as far as a permit decision is concerned. * * * By copy of this letter, we are advising the potential applicant of the requirements of the Corps Regulatory Program pursuant to the (Section) 404 review. For your information, the site review to reconnoiter potential enhancement areas within and adjacent to the mitigation acreage has been scheduled and confirmed for June 28, 1989."
On June 22, 1989, the Army Corps of Engineers wrote to George Vakalis, a general partner of the plaintiff advising of their knowledge of the plaintiff's intent "to construct an access roadway associated with a proposed office/hotel complex" on the subject property. At this time the Corps explained the requirement of a permit under Section 404 of the CWA for activities involving the discharge of dredged or fill material in wetlands and furnished a form and samples of necessary drawings.
These two letters from the Army Corps of Engineers were the plaintiff's first official indication of the defendant's interest in the condemnation of its property. It had no prior notice. Thereafter it received a notice of intent to condemn the land from the defendant. This was followed by two DOT appraisals and the commencement of eminent domain. The court CT Page 11686 notes that the taking map is dated July, 1989. Given this short notice of the forthcoming condemnation, the plaintiff ceased all further development activities. Bankruptcy followed thereafter.
The commercial development of land follows the development of highways. The construction of Interstate Highway I-84 from its inception was the catalyst in the development of the neighborhood here. The pictorial evidence of the commercial development of areas surrounding the subject site cannot be graphically stated in words. The plaintiff's property is located east of the east side of Southeast Road, Route 71, to which it is accessible by the condemned easements. It is south of the northerly terminus of this highway, and south of I-84 which adjoins Route 71 going east and west. The northerly extension of Route 71 in the Town of West Hartford is known as New Britain Avenue, and the extension to the south of the subject property is located in the Town of New Britain and known as Hartford Road.
The southeasterly intersection of Routes 71 and I-84 is the site of the Corbin's Corner Shopping Parkade. It was built in 1962 on 22 acres and is dominated by a major Sears, Roebuck Company retail outlet with a free-standing automotive service facility. The southwesterly intersection of these two highways is the location of the Westfarms Regional Shopping Center with four major department stores and about 130 retail shops.
On the west side of Route 71 opposite the plaintiff's easements was the former K-Mart Plaza, which opened in 1980 on 18 acres with two anchor stores and about 15 retail outlets. Builders Square, a home improvement supply store, replaced the K-Mart department store a few years ago. On the east side of Route 71, north and south of the plaintiff's easements to the highway the properties were developed in the 1970's and 1980's with a diversity of automobile services, fast food restaurants, sit-down food outlets, and satellite retail facilities.
Usually found at highway interchanges in the Greater Hartford area and missing in this neighborhood are hotels/motels and office buildings. It was for such purposes that the plaintiff purchased and proposed to develop the subject property until the defendant abruptly terminated all further steps in that direction and precipitated the plaintiff's great financial loss and insolvency. George Vakalis, a real estate developer, his son David, and Mark S. Levitz here the general partners of the plaintiff's limited partnership in this venture.
Vakalis became interested in the subject property some time before October 26, 1987, and obtained an option for its purchase pending the acquisition of access' to it from Route 71. On that date McDonald's Corporation conveyed by warranty deed to George Vakalis and Mark S. Levitz CT Page 11687 an easement 51.20 feet wide on the highway, Route 71, also designated Southeast Road in Farmington, and along the northerly border of its premises to the subject property located east of and contiguous with McDonald's property. Vakalis and Levitz thereafter transferred this easement by warranty deed to South Farms Associates Limited Partnership on April 25, 1988.
The fee to the subject property was conveyed on August 25, 1988 to the plaintiff by deed of the Connecticut National Bank, executor u/w/o Esther Holt for $380,000. On September 28, 1988, the plaintiff executed an open-end mortgage deed and security agreement in favor of Omnibank of Connecticut, Inc., in the amount of $2,500,000. Of this sum, the plaintiff received a total of $2,000,000 within two days, less a reserve of $650,000. After payment of three points to the bank, the plaintiff obtained $1,275,000 from this loan, the remainder, or $500,000, being held for contingencies, such as a proposed zone change. While not relevant to the issue here, it is noted that this mortgage loan was predicated on the bank's appraisal in 1988 of $4,900,000.
On September 28, 1988, the plaintiff also executed a declaration of restrictive covenants undertaking for ten years for the benefit of McDonald's that it would not establish or maintain on its adjoining property a food service establishment, with the exception of a luxury hotel and employee cafeterias. Further negotiations continued thereafter with McDonald's Corporation for a widening of the access easement and a relocation of its restaurant on the highway. These negotiations were terminated by the defendant's condemnation of the subject property.
The subject property is located in a B Business zone. Permitted uses include retail stores, including banks, personal and business services, business or professional offices, and the like. Special exceptions include the TPZ to authorize building heights up to five (5) stories. This provision was once included in the SD Special Development zone which governed land uses in the northwest area. The zone district classification of the northwest area, approximately 45 acres, would remain B Business District, until a petition for change of Zone Map is approved by TPZ." Although the maximum height allowed in a Commercial Development zone at the time of the taking was 35 feet (3 stories), under } 3.20.8 of the zoning regulations, the Commission "may authorize building heights up to five (5) stories if the character of the land and the immediate neighborhood would permit such an increase in height without detriment to the neighborhood or would not adversely affect the public welfare of the Town."
The subject property was proposed for development by the plaintiff as a mixed-use project, entitled Quadrangle Corporate Centre. The proposal CT Page 11688 included a five-story hotel/conference center containing 231,653 square feet with 262 suites, and two multi-story office buildings, each with approximately 160,000 square feet. Parking for the project was to be provided in a two-level garage whose top level would serve as a deck on which the three buildings were to be located. On February 22, 1989, Radisson Hotel Corporation conditionally committed itself to a possible franchise operation of the "suite hotel," stating: "Once all city approvals are in place and financing is eminent (sic), we should move to get the application submitted to our franchise committee for their approval."
Siting for the proposed project was to be the highland area located on the southern portion of the subject property, occupying approximately 9.2 of the subject's total 29.9 acres. It was estimated that the hotel would occupy approximately 3.86 acres (42 percent) and the office development 5.34 acres (58 percent). According to the proposed plans, the project was located entirely outside the wetlands area, except for an access bridge connecting the project to Route 71 via the easement over the land owned by McDonald's Corporation.
On November 9, 1988, the plaintiff applied to the Newington Town Planning and Zoning Commission for reclassification of the subject property to Commercial Development zone. The necessary site development plan did not accompany the application. A public hearing was scheduled for January 11, 1989. On the date of the proposed hearing, counsel withdrew the application because of the lack of a complete site plan.
The plaintiff's neighbor, Schnip Development Corporation, however, completed its application and received such a zone change for adjoining land. On November 8, 1989, the Town Plan and Zoning Commission approved the request of Schnip Development Corporation for a "Zone Map Amendment for property owned by T.S.M. Associates . . . , Shell Oil Company, Quadrangle Limited Partnership, Coleman Tulin, (15 acres) from B Zone to CD Zone," effective November 15, 1989. At the same time the Commission approved, with conditions, Schnip's site plan for a parking garage as an appropriate accessory use to the proposed 5-story principal office building and existing restaurant.
Four appraisers have testified in this matter, two for the plaintiff and two for the defendant. They all agree that the sales comparison approach is the best valuation methodology in this instance, and the court agrees. They disagree, however, on the highest and best use of the subject property at the time of the taking, as well as on its fair market value then.
The defendant's principal appraiser and the one whose appraisal set the assessment of damages paid, Michael Aletta, is an in-house appraiser in the CT Page 11689 defendant's Office of Rights of Way. In his opinion, "the subject property is non-buildable and its highest and best use is for open space." This is a confusion of terms. The concept of open space land is an environmental function or consideration of local government or a semi-public conservation entity. See General Statutes } 7-131b (a) providing for the acquisition by a municipality of "land in any area designated as an area of open space land on any plan of development of a municipality adopted by its planning commission. . . ." See also } 7-131j providing for the condemnation by the state for highway or other purposes of such land in an established open space program.
The appraiser's first of two comparable sales consisted of a private sale for $175,000 of a 10 acre parcel in Berlin containing about 50% of wetlands with a potential for residential development. The highest and best use of this property he classified as "Open Space/Residential Development." The second sale was a private transfer for $190,000 of about 32.9 acres in Newington and New Britain containing about 85% of wetlands with a potential for residential development of the balance. For this parcel he also found the highest and best use to be for open space and residential development.
Based on adjustments of these sales, the purchase price of $380,000 for the subject parcel, and an acquisition cost of $50,000 for the easement to Route 71, he found the damages from the taking to be $133,500.
The defendant's second appraiser was a private appraiser, John F. DeLucco. Although his appraisal of damages in the amount of $600,000 was conveyed to the defendant by letter dated August 10, 1989, almost seven weeks before the taking, it was not considered in the defendant's assessment of damages in the amount of $433,500.
In his view the highest and best use of the subject property would be for open space to provide an abutting property with more building capabilities on their respective sites." He expanded this opinion, however, by concluding: "An alternative use, after permission is granted by the Inland-Wetlands Commission and Building Department of the Town of Newington would be for Development, provided site meets the Department of the Army, Corps of Engineers, Guidelines for Wetlands as indicated in Addenda of this report."
Acknowledging that "[l]and market data is extremely limited due to the built-up nature of Farmington, Newington and New Britain," DeLucco utilized three sales of acreage several miles distant. The first sale was on the Berlin Turnpike, Route 15, in the eastern section of town. It contained 44.91 acres, some of which were wetlands. Its highest and best use was for commercial development. This property sold on May 25, 1989, four months CT Page 11690 before the taking, for $89,000 per acre.
The second sale was in Berlin, a neighboring town to the south. It consisted of 38.5 acres, also with some wetlands. This property was also best utilized for commercial development and sold twenty-one months before the taking for $87,700 per acre. The final sale was in Wethersfield, an adjoining town on the east. Its area was 42 acres and it also included wetlands The highest and best use of this tract was for residential development. This sale took place two months before the taking for $64,428 per acre.
After making his adjustments to the subject property based on these sales, Delucco estimated that a value range for the taking was $19,500 to $22,000 per acre. His final opinion was that the value of the subject property fell below the median price to $20,000 per acre. The damages to the plaintiff, therefore, he calculated to be $600,000.
The plaintiff's appraisals were very comprehensive. Dean C. Amadon, a long-experienced local appraiser, concluded that after examining the market forces shaping the development of the subject area, after reviewing the zoning developments in this section of Newington, and after considering the possible uses under the former, present and proposed zoning classifications of the subject property, "the office and motel/conference center uses included in the proposed Quadrangle Corporate Center proposal represented the most productive, physically, economically and legally feasible use to which the subject could be developed and thereby reasonably represented the subject's highest and best use."
Amadon utilized the direct sales comparison approach in his appraisal. His comparable sales were bifurcated into two parts, one for the evaluation of the proposed office building site of 5.34 acres, and the other for evaluating the proposed hotel site of 3.86 acres. Three sales of land in early 1988 utilized for office construction at 10 Waterside Drive, Farmington; 360 Tolland Turnpike, Manchester; and 200 Glastonbury Boulevard, Glastonbury; were compared. The sale price per building foot was $14.93, $17.54 and $16.32, respectively. Based upon these sales and considering adjustments for factors affecting valuation, he estimated the fair market value of the land proposed for office use to fall within a range of $15 and $20 per square foot of gross building area, with a most probable selling price of $17 per square foot.
The same methodology was utilized for estimating the value of the hotel site of 3.86 acres. Five sales of land between September 30, 1988, and December 15, 1989, utilized for the construction of a hotel/motel were compared. These were located in East Hartford, Windsor Locks, Cromwell and CT Page 11691 Manchester. The sale price per room ranged from $7,853 to $16,071. Adjusting these sales for factors affecting valuation, he estimated the fair market value of the land proposed for the suite hotel to range-between $9,000 and $15,000 per room, with a most probable selling price of $12,000 per room.
Utilizing these land value factors representing the uses proposed for development, he estimated the proposed office land of 5.34 acres at $5,440,000 and the hotel land of 3.86 acres at $3,144,000 for a total value of the subject land for the combined development of $8,584,000. From this estimate he subtracted the following penalty costs peculiar to the proposed development: $1,700,000 for the demolition/relocation of McDonald's to provide additional site access, and $1,635,900 for construction of the access road to Route 71. The difference, or $5,248,100, rounded to $5,250,000, was his opinion of the value of the taking.
An earlier appraisal for the plaintiff by Norman R. Benedict, of Hamden, supported an even higher estimate of damages.[1] His resume shows extensive national professional recognition and experience for almost four decades. In his opinion the highest and best use of the subject property was for improvement with a quality transient housing hotel and two office buildings of the size proposed by the plaintiff.
In his determination of fair market value of the land taken, Benedict allocated the total site of 29.9 acres to the hotel and office components based upon their gross square foot building areas. The hotel represents 42% of the gross building area and is allocated 42% of the site. This is 12.56 acres of land, of which 3.86+/- acres is upland. The offices represent 58% of the building area. This is 17.34 acres of total site and 5.34 acres of the upland.
Twenty-eight motel land sales in the state between 1983 and 1989 were studied. From his analysis of various relevant valuation factors, he concluded that the contributed value of 262 suites at $15,000 per suite was $3,930,000, rounded to $3,950,000. Thirty-one office land sales in the Greater Hartford area between 1986 and 1990 were studied. From this comparison he estimated that the unit value of $30 per square foot was indicated for the 316,224 square feet of office space developable on the 17.34 acres, thereby contributing a value of $9,486,720. Since the hotel was estimated to be built first, and the two office buildings in sequence thereafter, this value was discounted to $6,950,000. His total valuation for the entire tract, therefore, was $10,900,000.
From this determination, Benedict subtracted the following penalty costs: $391,550 for special utilities; $1,835,900 for special access; $1,150,000 for the construction of a new McDonald's; and $923,822 for CT Page 11692 remaining permits. The difference of $6,598,728, rounded to $6,600,000, was his estimate of the damages resulting from the taking.
Just compensation in eminent domain is the market value of the condemned property when put to its highest and best use at the time of the taking. Minicucci v. Commissioner of Transportation, 211 Conn. 382, 384
(1989); Cappiello v. Commissioner of Transportation, 675, 681 (1987); Budney v. Ives, 156 Conn. 83, 88 (1968). "In determining market value, `it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . .' Budney v. Ives, supra. Because a change in zoning restrictions obviously could affect the price of real property, `where such a change is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair value' of the property. Id.; Transportation Plaza Associates v. Powers,203 Conn. 364, 375 (1987). `[T]he true issue is, not the value of the property for the use which would be permitted if a change in zone was made, but the value of the property as zoned at the time of the taking as it is affected by the probability of a change.' Budney v. Ives, supra, 89." Greene v. Burns, 221 Conn. 736, 745 (1992).
We find that except for the taking, it was reasonably probable that the zone of the subject property would have been reclassified from Business B to Commercial Development; and further that the highest and best use of the property was for commercial development as permitted by this zone classification.
The subject site was part of a distinct commercial district in the northwest corner of Newington whose zoning definition shifted frequently over the years as the surrounding area developed. On January 8, 1986, its CD classification was down-zoned to the less restrictive Business B zone. As noted earlier, on November 9, 1988, the plaintiff applied to the Town Planning and Zoning Commission (Petition 80-88) for reclassification of the subject property to CD zone.
A town planning staff summary of the Northwest Area Zone Report — Proposed (B) Business To (CD) Commercial Development — Petition 80-88 — Hearing January 11, 1989" supported this zone change as follows, in part: "The proposed CD (Commercial Development) Rezoning of the 45 acre area at the northwest corner of Newington conforms to the future land use recommendations of the 1984 Plan of Development. The Plan designates this area as the West Farms Commercial Development Area. . . . The construction of the Central Connecticut Expressway (CCE Rte 9) with a full interchange at Rte 71 and the widening of Rte 71 are improvements in the road network which will substantially alter the character of this area to the extent that CT Page 11693 reclassification is warranted." (Emphasis added.) The proposed zone change for the Schnip Development Corporation portion of the area went forward and was subsequently approved on November 8, 1989.
Additionally we find it reasonably probable that local, state and federal wetlands permits would issue, at least conditionally, for the development of the uplands portion of the subject site.
The defendant has raised one other factor relative to the valuation of the taking, namely, the economic feasibility of the proposed project. The true issue is not the value of the property for the specific use which would be permitted if a change in zone was made, but the value of the property as zoned at the time of the taking as it is affected by the probability of a change. Greene v. Burns, supra.
Under our law, a state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, a review of the evidence, his general knowledge, and his viewing of the premises. Minicucci v. Commissioner of Transportation, supra, 388; D'Addario v. Commissioner of Transportation, 180 Conn. 355,366 (1980). In the performance of this duty, based upon all the circumstances, our consideration of the evidence, our general knowledge of the elements constituting value, and our viewing of the property, we find that the value of the land taken is $1,233,000. Damages, therefore, are assessed at $1,233,000.
Judgment may enter for the plaintiff in the amount of $1,233,000, less $433,500 previously paid, or an excess of $799,500, with interest on such excess from the date of taking to the date of payment at the rate of 10% per annum, together with costs, and a reasonable appraisal fee of $15,000.
John M. Alexander
George D. Stoughton
William C. Bieluch State Trial Referees