[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
REPORT OF COMMITTEE APPOINTED BY THE COURT TO ASSESS DAMAGES ON AN APPEALBY THE PROPERTY OWNER, MARY B. TANNER, FROM A TAKING BY IROQUOIS GASTRANSMISSION
CT Page 11957
Pursuant to General Statutes, Sec. 16-266, the undersigned were appointed by the Superior Court as a committee of three disinterested persons to determine the compensation to be paid to Mary B. Tanner for the taking by Iroquois of a permanent and temporary easement for a natural gas transmission pipeline over her land in Newtown, Connecticut.
On February 27, 1991, the taking day, Iroquois took a permanent easement consisting of 1.79 acres and a one year work space easement consisting of 1.01 acres on Mary Tanner's land. The permanent easement includes the following language:
 Furthermore the Respondent and its successors in ownership of the above premises shall have the right to construct NO MORE THAN TWO ROADWAYS OR DRIVEWAYS ACROSS SAID RIGHT OF WAY generally at right angles to the above described line of location and to pass and repass on foot and in vehicles over and across SAID ROADWAYS OR DRIVEWAYS, SUBJECT TO THE REASONABLE PRIOR WRITTEN APPROVAL BY PETITIONER OF THE LOCATIONS OF SUCH ROADWAYS OR DRIVEWAYS. . . . (Emphasis added.)
 The Petitioner did not present any evidence that the aforesaid prohibition could be relaxed.
The permanent easement is 50 feet wide and 1,558.6 feet in length. A 25 foot work space easement adjacent to the permanent easement was also taken. (Detailed information is found in Plaintiffs' Exhibit A, Map of Proposed Pipeline and Plaintiffs' Exhibit E, Map of As-Built Natural Gas Pipeline.) The overall Tanner property consists of 42.01 plus or minus acres zoned for two acre residential use, lying southeasterly of Route 34 in the southeastern part of Newtown, Connecticut. With the exception of a CLP electrical transmission line, and the laying of the gas pipeline, the land is completely undeveloped and in a natural condition. The property has approximately 762 feet of frontage on the south side of Route 34 with about 349 feet at the CT Page 11958 northwestern corner of the property separated by private property from about 413 feet of frontage at the northeastern corner of the property. The property is basically rectangular, although irregular in shape. The southern boundary is an irregular line along the center line of the Halfway River. The property is bisected in a generally east/west direction by an 80 foot permanent CLP easement for the running of high tension lines on high towers over the land. This easement was in place when Tanner acquired the property in 1972. The joint effect of the CLP and Iroquois easements is to divide the property into four unequal quadrants as follows: northeast quadrant 5.3 plus or minus acres; southeast quadrant 3.8 plus or minus acres; northwest quadrant 10.6 plus or minus acres; and southwest quadrant 18.4 plus or minus acres. The remaining land consists of the CLP easement 2.13 acres and the Iroquois easement 1.79 acres.
The property slopes significantly downward from west to east and from north to south. Elevation at the northwestern corner along Route 34 is approximately 380 feet above sea level and at the northeastern corner, along Route 34, approximately 280 feet above sea level. At the approximate mid-point of the CLP easement, elevation is 290 feet above sea level and along the Halfway River between 190 to 200 feet above sea level. There are significant wetlands along the Halfway River, and throughout other parts of the property there is a total of 7.1 plus or minus acres of wetlands to one degree or another. Electric and telephone service is available to this site. The land was assessed for $137,200 on the 1990 grand list, with a forest land assessment of $2,940.
The committee examined this site in the company of counsel on September 27, 1994, Significant rock formations were noted where the property abuts Route 34. The day was extremely wet and the rough-hewn road traversed into the property was steep and bumpy so that the committee did not leave the vehicle carrying them on the inspection except when it halted about in the middle of the intersection of the two easements. At this juncture, the committee dismounted and walked briefly along the grass covered pipeline easement in an easterly direction for several hundred feet. The committee was not requested to nor did it make further inspection to examine the whole site. The committee saw very rocky, rough and heavily wooded land except for the cultivated area under the CLP easement and over the Iroquois easement. The CLP easement contained large unsightly metal towers containing near the top a typical collection of high tension lines. As one CT Page 11959 would expect, there was no evidence of the pipeline easement lying underground, other than the cleared and seeded area of the easement.
Mary Tanner did not seek to subdivide the property prior to the taking nor were any concrete steps taken after the taking to accomplish this. A seventeen (17) lot subdivision development plan was drawn for Tanner for use in this condemnation case.
The hearing was held from September 27 through September 29, 1994. Iroquois paid in at the taking $40,500 which had been paid to Mary Tanner. Iroquois claimed that damages should be assessed at $30,000, while Tanner claimed $333,000 in damages.
Fred Tanner, husband and agent of the owner, testified creditably concerning the background of Mary Tanner's ownership of the property. The piece of land was acquired in 1973. Title was taken in Mary Tanner's name, but it was always expected that he would handle the development and eventual disposition of the property. Until he retired five years ago, he was active as a builder and subdivider of land. Mr. Tanner negotiated with the seller, Mrs. Loveland, and promised her he would not develop it in her lifetime. He secured a forest land designation which kept the property taxes very low. Had it been sold within ten years of that designation, there would be an additional conveyance tax to Newtown under General Statutes, Sec. 12-504a.
The deal with Mrs. Loveland and the forest land designation dovetailed with the Tanner's intent to bank the tract and to develop it for sale to a developer when the market was right. They planned that this land would be their social security. Mr. Tanner testified that he received an offer in 1983 or 1984 for $500,000, which he rejected. We take this assertion with a grain of salt, lacking corroborative detail. In any event, its relevance is very remote to the question of the value of the land in February, 1991.
Their plans for this land gave them no reason to begin the subdivision process prior to notice of Iroquois's intention to take a pipeline easement because they were waiting for marketconditions to improve before doing so. (Emphasis added.)
Mr. Stephen Bombero, Sr. was hired by the Tanners, after the taking, to plan and develop a proposed subdivision of the land to best market the land as a residential subdivision in the light of CT Page 11960 the two easements. He is an experienced and reliable professional surveyor with extensive experience in land development and all types of tracts. We gave a high degree of credibility to his proposed subdivision, only questioning his opinion when he stated that as to degree of difficulty of developing a plan that would probably be accepted by regulatory authorities, he would rate this project as a 5 or a 6 on a scale of 1 to 10. We opine that this estimate is very much on the rosy side of things. The Bombero plan showed seventeen lots and was likely as feasible a plan as could be developed in view of the unusual conditions on the site. We concluded that Mr. Bombero satisfactorily explained a reasonable solution to site line improvements that would be required to get state approval where the proposed road would enter Route 34. Mr. Bombero also said that percolation and deep hole tests were satisfactory to get septic approvals. He found the existing wetlands to be no unusual problem and that the proposed open space on the plans should be able to be approved by the town.
Before analyzing the expert appraisal evidence in the case, we advert to the case of Robinson v. Town of Westport, 222 Conn. 402
(1992) for precise delineation of the legal principles which must guide our deliberations (Judge Saden, a member of this committee, was also a member of the committee whose statement of compensation for taking by Westport was eventually approved and upheld in the Robinson case). The trial court had rendered judgment increasing the award of damages, from which the plaintiffs appealed to the Supreme Court of Connecticut. The trial court agreed with the plaintiffs that the land had been undervalued, but did not adopt the method used by any of the appraisers. The court independently determined the fair market value of the property at a higher figure than the taking price.
The plaintiffs first claimed that by rejecting their appraisal method, i.e., the lot method, the trial court inferentially rejected a proposed residential subdivision as the highest and best use of the property. The Supreme Court held that the trial court never rejected a subdivision as the highest and best use.
The court stated at page 405:
 `The owner of land taken by condemnation is entitled to be paid just compensation . . . .' Minicucci v. Commissioner of Transportation, 211 Conn. 382, 384, 559 A.2d 216 (1989); Conn. CT Page 11961 Const., art. I, Sec. 11. The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. Minicucci v. Commissioner of Transportation, supra; Cappiello v. Commissioner of Transportation, 203 Conn. 675, 681, 525 A.2d 1348 (1987); Budney v. Ives, 156 Conn. 83, 88, 239 A.2d 482 (1968). In determining market value, "it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . .' Budney v. Ives, supra. Greene v. Burns, 221 Conn. 736, 745, 607 A.2d 402 (1992). "The `fair market value' is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use.' Mazzola v. Commissioner, 175 Conn. 576, 581-82, 402 A.2d 786 (1978).' Minicucci v. Commissioner of Transportation, supra, 384. `The `highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate.' State National Bank v. Planning Zoning Commission, 156 Conn. 99, 101, 239 A.2d 528 (1968). `In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the subject property will be subdivided.' Minicucci v. Commissioner of Transportation, supra, 385.
 While we agree that all the appraisers operated under the assumption that a residential subdivision was the highest and best use of the property and that they all used the lot method to determine its fair market value, we do not agree that the trial court, in rejecting the lot method, failed to consider the highest and best use of the property. The trial court rejected as too speculative, given the evidence presented, the lot method of determining the fair market value of the proposed residential subdivision. The trial court instead determined that, under the facts of this case, the proper method for arriving at the fair market value was to evaluate the land in its condition at the time of the taking, i.e., raw and undeveloped, "with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development.' (Emphasis added.) 4 P. Nichols, Eminent Domain (3d Ed.) Sec. 12.3142[1][a], pp. 12-335-356.' Minicucci v. Commissioner of Transportation, 211 Conn. 382, 385, 559 A.2d 216 (1989). In order to value the land, the trial court had at its disposal evidence of sales of comparable land in addition to the raw data used by the appraisers in applying the lot method. Because the trial court specifically CT Page 11962 stated that it had considered the property's use as a subdivision in valuing the land, we conclude that it did not reject such proposed use as the highest and best use of the land.
The court further stated at page 408:
 `We think the better view . . . is that a lot method appraisal can be admitted in appropriate cases if the proponent offers credible evidence of the costs of subdivision — e.g., the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold. . . . The potential value of land if subdivided could well be considered by a willing buyer and a willing seller where subdivision is a reasonable possibility and the costs of subdivision are not speculative or uncertain.' United States v. 47.3096 Acres, Etc., In Oxford Township, 583 F.2d 270, 271-72 (6th Cir. 1978). In the instant case, the trial court simply concluded that the plaintiffs' evidence was too speculative and uncertain to allow the use of the lot method of valuation.
Finally, the Supreme Court mapped our course precisely when it stated at page 410 that:
 `[T]rial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . `In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of . . . [the] opinions of [expert] witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises." (Citations omitted.) French v. Clinton, 215 Conn. 197, 200-201, 575 A.2d 686 (1990). We conclude, therefore, that the trial court was not, as a matter of law, bound by the valuations or valuation methods used by the appraisers but could consider the comparable sales of land that were in evidence as well as the raw data utilized in the presentation of the lot method approach in independently determining fair market value. Second Stone Ridge Cooperative Corporation v. Bridgeport 220 Conn. 335, 342, 597 A.2d 326 (1991) (an analysis of comparable sales is a valid method for determining the fair market value of property.'
We consider first the appraisal report (Defendant's Exhibit 4) and matching testimony of Steven A. Breiner of Larson Associates. He concluded that the effects of the taking would damage the property by causing loss of land from the easement, CT Page 11963 loss of developmental use and increased costs of development. He found the market value of the land, as of February 26, 1991, to be $670,000, with the value of the property immediately after the taking at $337,000, so that the damage was $333,000. For reasons to follow, we find his expert testimony to be of minimal credibility and weight in our deliberations. An example of his gilding the lily is found on page 8 of his report wherein he states that the average home in the area is in the $300,000 range. A most cursory view of houses seen in the near area of Route 34 revealed this to be a gross exaggeration, as most of the homes observed by the committee were modest, smaller, older houses falling far short of this value. He properly used, as did the other two appraisals in evidence, the direct sales comparison approach or market approach as all agreed that income capitalization or cost less depreciation were inappropriate in this case. All three appraisers found the highest and best use of the land to be as a two acre residential subdivision. We comment on this conclusion below.
The Achilles' heel of his analysis is found on page 8 of Exhibit D wherein he states:
 The Market Approach is traditionally an appraisal procedure in which the market value estimate is predicated upon prices paid in actual market transactions and current listings, the former fixing the lower limit of value in the static or advancing market (price-wise), and fixing the higher limit of value in a declining market, and the latter fixing the higher limit in any market. It is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. The reliability of this technique is dependent upon: a) the availability of comparable sales data; b) the verification of the sales data; c) the degree of comparability or extent of adjustments necessary for time difference; and d) the absence of non-typical conditions affecting the sales prices. Comparisons of similar properties are made and adjustments for differences are analyzed.
 The subject property consists of undeveloped land. When appraising undeveloped land, comparisons of like properties can be made with other parcels of undeveloped land that had been recently sold or other developed parcels of land for which individual lot sale prices are known. Data on sales of comparable raw land to developers, if available, is the best evidence of value. In researching the Newtown records, the data for raw land sales was considered unreliable. The CT Page 11964 great differences between sales prices on a per acre basis did not supply adequate information. Typically, a parcel of land varies in topography, size, shape, road frontage and zoning. Because of these variables, there is no consistent per acre data available in Newtown. The range causes this data to be unreliable.
 Comparisons, however, can be made based on the anticipated use or development procedures that are applicable to raw unsubdivided land. These considerations are based on the applicable zoning and subdivision regulations, topography and market conditions. Comparisons between sales for developed lots and subdivision expenses are made. The subject property has been analyzed on an anticipated use basis.
Before commenting on why we conclude that this approach vitiates the effect of his expert testimony, it is incumbent on this committee to expatiate on its conclusion concerning the highest and best use of the property on February 26, 1991. Our conclusion is firmly based on the statements of both Mr. Breiner and Mr. Nocera, Iroquois' expert witness concerning market conditions in Newtown in February, 1991. Mr. Breiner states in part on page 10, "The market conditions in February 1991 werethat of oversupply." (Emphasis added.) Further, on page 10, he states that "[A]s of February, 1991, the oversupply of building lots increased absorption time." In compelling agreement with this opinion is the statement of Iroquois's appraiser on page 10 of Plaintiff's Exhibit F that:
 The subject property consists of 42.01 plus or minus acres of raw, unimproved, unapproved, residentially zoned (R-2, Two Acre Residential) acreage located with approximately 762 feet of frontage along the south side of Berkshire Road (Connecticut Route 34) in the extreme southeastern portion of the Town of Newtown, Connecticut. In determining the `Highest and Best Use' of the subject, we must consider its location, present applicable zoning regulations, current economic conditions, and the real estate market in the area. At the effective date of this report (February 26-28, 1991) there was an oversupply of single-family building lots within the Newtown market area and economic and market conditions were such that it would not have been prudent to develop the property. Therefore, while current zoning would seem to indicate that the `Highest and Best Use' for the subject would be for residential development, the short range `Highest and Best Use' would be to hold the property for future development when marketing conditions are more favorable for such development. CT Page 11965
We fully accept the unadorned opinion of both Mr. Breiner and Mr. Nocera that on February 27, 1991 there was an oversupply of single family building lots and that the highest and best use of the property on that date was to hold on to it for future residential development when marketing conditions are more favorable for such development.
It follows inexorably from this conclusion that although Tanner's plan of development is marginally relevant to current value under the Robinson case, the most logical and persuasive evidence of the value of the raw land on February 26, 1991 is a sales comparison approach with other raw land in Newtown.
In this regard, it is highly cogent to consider the reasons given by Mr. Breiner for not using raw land comparables at page 8 of Defendant's Exhibit 4:
 The subject property consists of undeveloped land. When appraising undeveloped land, comparisons of like properties can be made with other parcels of undeveloped land that had been recently sold or other developed parcels of land for which individual lot sale prices are known. Data on sales of comparable raw land to developers, if available, is the best evidence of value. In researching the Newtown records, the data for raw land sales was considered unreliable. The great differences between sales prices on a per acre basis did not supply adequate information. Typically, a parcel of land varies in topography, size, shape, road frontage and zoning. Because of these variables, there is no consistent per acre data available in Newtown. The range causes this data to be unreliable. (Emphasis added.)
It must be noted that Mr. Breiner stated that when appraising raw land, data on sales of comparable raw land to developers, if available, is the best evidence of value. Then, however, after this strong statement with which we agree, he completely backs off because there is no consistent per acre data available in Newtown. This backtracking could be used in most cases. A much more logical and professionally acceptable approach is that of Mr. Nocera who used four raw land comparables and then adjusted them for various ups and downs when used to help value damages in this case.
Further, when Mr. Breiner listed improved lot comparables (Defendant's Exhibit 4, p. 9), he gave no explanatory summary of each lot's characteristics, unlike Mr. Nocera who explained in meaningful detail salient factors concerning each comparable. CT Page 11966
Two additional factors buttress our view of the minimal credibility that should be given to Mr. Breiner's testimony and appraisal report. He explains succinctly (bottom of page 9) by way of adjustment that "[a]ll I had average or better topography," a stark contrast to the Tanner property. Finally, to add insult to injury, the committee was not even asked to view all or any of his comparables. So much for Mr. Breiner's comparables.
We found Mr. Nocera's appraisal (Plaintiff's Exhibit F) and corresponding testimony much more professionally reasonable and persuasive. He found the market value of the subject property immediately prior to the taking to be $230,000 and immediately after $201,000. The permanent easement, he claimed, caused $29,000 damages and the temporary easement caused $600 damages for a total of $29,600, rounded out to $30,000 damages.
We note the following concerning his report. It is comprehensive and clearly stated. The pictures of the four comparables are very helpful and relevant. We reviewed the four comparables and were able to relate them to material in the report. The detailed general background information (pages 4 to 16) was extremely informative to the committee.
To illuminate our ultimate conclusion, it is prudent to discuss the four comparables in some detail.
1. No. 1 — (page 20, Plaintiff's Exhibit F) 46 Sugar Lane. This property appeared in the viewing to be quite desirable for development. Although it was apparently part of a package deal with sale No. 2, its price per acre ($7,256) made sense.
2. No. 2 — 102-104 Head of Meadow Lane. The most noticeable feature of this land was the very limited access, which necessitated the building of a new road. It was also very hilly, rocky and heavily wooded. In general, it seems to be quite similar to the Tanner property. We hold it to be somewhat less desirable than the Tanner property with the exception of the CLP easement over Tanner. Price per acre $5,710.
3. No. 3 — Great Ring Road and High Rock Road — the Fish and Game Association property. This was the most attractive piece we saw, with the fewest drawbacks. This piece was clearly superior from a developmental viewpoint to the Tanner property. Price per CT Page 11967 acre $19,070.
4. No. 4 — This is also to the eye an attractive and easily developable piece of property. It has some similarities to the Tanner property but appears to be less steep. For what it is worth, we note that the low-ball price per acre ($3,602) concerning land bought from the Gateway Bank would appear to indicate that it was land that the bank had foreclosed and wished to liquidate.
Mr. Nocera made typical adjustments to the comparables in accordance with common appraisal practice. For our purposes, we conclude that averaging the four comparables will produce at least as probative a method, if not more so.
Before proceeding to our final assessment of damages, we note certain general conclusions as follows:
1. A before taking value should be determined based on the average of the four comparables.
2. As indicated earlier, the potential for development as the market strengthened should be included as a factor in this determination.
3. The Tanner property cannot be graded as a moderately easy piece to develop but rather as an unusually difficult one.
4. The provision in the pipeline easement of not more than two crossings is a serious impediment to developability.
5. We do not attribute any element of damages to a possible public fear of damages near the pipeline since there was no evidence of such a fear, valid or not.
6. Since we opt to treat the damages on the basis of raw land beforehand, no compensation is determined on a lot basis, except as the potential development in general may affect the damages.
7. Defendant's Exhibit 3 is the appraisal report of Paul B. Marshalka of the Real Estate Advisory Group. This report had been prepared for Iroquois and a copy of it furnished to counsel for Tanner. Iroquois chose not to proffer this report or Mr. Marshalka as an expert witness. Counsel for Iroquois claimed that CT Page 11968 it was admissible on the authority of Thomaston v. Ives,156 Conn. 166 (1968), on which basis we admitted it into evidence. We note, in passing, the scanty information provided concerning the high priced comparables listed in the comparable land adjustment table, as well as the fact one comparable was in October, 1989, light years away from February, 1991, in terms of real estate values in Newtown. Mr. Marshalka's conclusions cut both ways in this case. His before value of $672,200 favors the Tanner side and his total damages of $23,100 favors Iroquois. (Figures found in unnumbered transmittal letter of August 27, 1992.) We have concluded that this report, coming down as it does on both sides of the ultimate issue, sheds no light on the question before us, and we have not considered it in our deliberations.
To sum up, the average of the four Nocera comparables per acre is $8,750 rounded out, $8,750 times 42 acres is a gross figure, absent the CLP line of $367,500. We deduct from this figure 25 percent of the land value as the lessening in value because of the high tension line, making the before taking value of the land $275,625 rounded out at $275,000.
We conclude for all of the reasons stated herein that the Iroquois taking reduced the value of the Tanner property by 40 percent, or $110,000, making the after taking value of the land $165,000.
We conclude the taking damage is $110,000.
John N. Reynolds, State Trial Referee
George A. Saden, State Trial Referee
T. Clark Hull, State Trial Referee