[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant, ATC Partnership (ATC) appeals from the Statement of Compensation in the amount of $1.00 filed upon the taking of the property known as the Windham Mill in Windham, Connecticut. The court finds the just compensation for the property at the time of taking to be $1,721,165.00.
History of the Case
The plaintiff filed its Statement of Compensation in the amount of $1.00 on August 12, 1994. The defendant filed its appeal on November 2, 1994. The plaintiff, Northeast Connecticut Economic Alliance, Inc. (Northeast), is the statutory implementing authority and condemning authority for the Town of Windham. The Windham Mills Development Corporation (Windham Mills) acquired title to the property from the town in early November 1994. It is not a party to this action. The matter initially was tried before Harry Hammer, JTR. The court heard testimony on the defendant's appeal over a number of days in 1997 and 1998.
In September of 1998, the court ordered the appointment of an independent and impartial expert witness to appraise the property, which was done by December of 1998, and the court held additional hearings in March of 1999 and rendered its decision on September 14, 1999. Both parties appealed to the Appellate Court and the matter was transferred to the Supreme Court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c). The Supreme Court determined that the trial court committed error by excluding, as a matter of law, the evidence of environmental contamination and remediation costs and reversed the judgment of the trial court. The case was remanded to the trial court for a new trial. The plaintiffs Northeast and Windham, participated in the retrial as did the defendant, ATC. Numerous named defendants did not file appearances in the case and certain other defendants, including Connecticut Light Power, the Daiwa Bank Ltd., and Michael Rosenberg CT Page 2189 SE, apparent lienholders on the property, did not participate in the trial. The trial continued over seven trial days commencing on October 29, 2002 and concluded on November 13, 2002. The court inspected the site pursuant to Gen. Stats. § 8-132 in the presence of counsel on November 8, 2002.
In addition to the condemnation suit presently before the court, there is also a replevin action concerning personal property which ATC claims was wrongfully taken by the town, which is presently before the Supreme Court, Docket No. S.C. 16858, Superior Court Docket No. (X04) CV-95-0125966-S, and the so-called tax case Docket No. (X04) CV-96-0125207-S.
History of the Property
The total Windham Mills complex consists of approximately 40 acres on both sides of the Willimantic River located in Willimantic in the town of Windham. There are two dams on the property, both contain hydro-electric turbines and which were subject to lease at the time of the condemnation.
The Willimantic Linen Company which made thread, yarn and specialized in string products made the first industrial use of the site in 1854. In 1898, the American Thread purchased the site. That company's operations grew and buildings were added into the middle of the last century when the facility reached its configuration as of the time of the condemnation. In the early 1980s, American Thread began cutting back on production and by 1985 had moved all of its operations out of Connecticut. In 1986, the property was sold by American Thread to Eastern Connecticut Industrial Park Associates. In December 1986, the most easterly portion of the property (adjoining Mill 4 on the southern side of the Willimantic River) consisting of mostly undeveloped vacant land was sold to unrelated parties. ATC purchased the land subject to this action from Eastern Connecticut Industrial Park Associates in 1987.
Since the mid 1980s a number of plans have been considered for use of the property. Prior to the sale in 1985, American Thread proposed a mixed use redevelopment primarily for outlet stores. This plan was not pursued. In the early 90s another mixed use development at the site was considered. The primary focus was housing. Although approved by the zoning commission in 1992, this plan was dropped because of adverse economic climate for housing. In 1991, a portion of the site was designated as Windham State Heritage Park, the first of Connecticut's proposed heritage park system. The park designation was the result of an extensive effort led by the Windham Textile History Museum and CT Page 2190 recognized the historic and educational importance of the mill complex. In 1993, a master action plan for the Windham Mills and Windham State Heritage Park was prepared for the town of Windham (the Master Action Plan, Exhibit 16). This plan was prepared with substantial input from the ATC partnership, from the community and from others. That plan, upon which the town of Windham proceeded, considered the parcel to be approximately 38-1/2 acres including undeveloped land. The plan envisioned three distinct areas, a parcel 10.5 acres located between Main Street and the river containing the main complex of buildings, the parcel across the river consisting of approximately 22 acres containing the Mill 4 property and a parcel of 5+ acres east of the main mill, which is a vacant parcel but once contained Mill 3. During the period in the early 90s immediately preceding the condemnation, there were negotiations between ATC and the town for the sale of the property. These apparently never were successful and Northeast filed its Certificate of Taking on September 9, 1994. For several years prior to the taking in 1994, the plaintiffs and the defendant had been actively involved in a non-adversarial effort to obtain government funding for the rehabilitation and redevelopment of the property pursuant to the Economic Development and Manufacturing Assistance Act of 1990, Gen. Stats. §§ 32-220 through 32-234.
At the time of taking, there were approximately 21 buildings on the site. The term "approximately" is used because a number of buildings isn't finite due to the fact that some of the buildings are connected and interconnected. For instance, the main mill, or Mill 2, consisted of Building 22 and was connected to Buildings 23, 24 and 25. This structure is also sometimes referred to as Buildings 2, 2A, 2B and 2C. The annex, which was located between Mill 5 and Mill 6, also known as Buildings 55 and 56, did not have a separate numerical designation.
The total square footage of all buildings at the time of taking was in excess of 1,104,000 square feet. The property was located in Zones M-5A, M-5B and M-5C, which would accommodate light industrial use. In addition, the approximate 16 acres on the north side of the Willimantic River had been designated as an enterprise zone prior to the time of taking. The Mill 4 site was not in an enterprise zone. Both parties' appraisers agreed with the conclusions set forth in the Master Action Plan that the highest and best use for the subject property was light industrial with ancillary office support use. The Master Action Plan had determined that this was the highest and best use and rejected any converted use for housing because of the soft housing market in the area. The Court also accepts this proposed use as the highest and best use of the property.
Discussion CT Page 2191
Issues Presented
The ultimate issue in any condemnation case, including this, is: what is just compensation for the property of the condemnee? In order to arrive at that conclusion, the court must consider the general rules applicable to condemnation cases in determining the value of the property taken and the appropriate methods of valuing the property. The court then applies the appropriate methodology to the facts of the case to determine just compensation. In addition, in this case, the court may have to determine whether or not the amendment to Gen. Stats. § 8-132 set forth in Public Act 00-89 is retroactive and should dictate how the court sets forth its findings. Lastly, the court must determine the appropriate rate of interest on any award.
(a) General Rules with Respect to Condemnation
Fortunately in the consideration of this case by our Supreme Court, the general rules were clearly set forth:
 We begin our analysis of this claim by setting forth the general, well established principles that govern the taking of real property by eminent domain. The fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment; Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. Article first, § 11, of the Connecticut constitution similarly provides that "[t]he property of no person shall be taken for public use, without just compensation therefor." This constitutional principle is well reflected throughout the General Statutes and our case law. See, e.g., Minicucci v. Commissioner of Transportation, 211 Conn. 382, 384, 559 A.2d 216 (1989) ("[t]he owner of land taken by condemnation is entitled to be paid just compensation" [internal quotation marks omitted]). "[T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken. Colaluca v. Ives, [150 Conn. 521, 530, 191 A.2d 340 (1963)]." (Internal quotation marks omitted.) Alemany v. Commissioner of Transportation, 215 Conn. 437, 444, 576 A.2d 503 (1990); see also Commissioner of Transportation v. Towpath Associates, 255 Conn. 529, 540, 767 A.2d 1169 (2001).
We have stated repeatedly that "[t]he amount that constitutes just CT Page 2192 compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. Minicucci v. Commissioner of Transportation, [supra, 211 Conn. 384]; Cappiello v. Commissioner of Transportation, 203 Conn. 675, 681, 525 A.2d 1348
(1987); Budney v. Ives, 156 Conn. 83, 88, 239 A.2d 482 (1968). In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . Budney v. Ives, [supra, 88]. Greene v. Burns, 221 Conn. 736, 745, 607 A.2d 402 (1992). The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. Mazzola v. Commissioner, 175 Conn. 576, 581-82, 402 A.2d 786 (1978). Minicucci v. Commissioner of Transportation, supra, 384. The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. State National Bank v. Planning Zoning Commission, 156 Conn. 99, 101, 239 A.2d 528 (1968)." (Internal quotation marks omitted.) Robinson v. Westport, 222 Conn. 402, 405-06, 610 A.2d 611 (1992). "`In determining its highest and best use, the trial referee must consider whether there was a reasonable probability'" that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking. Id., 406; see also Greene v. Burns, supra, 748 ("[t]he questions of the highest and best use of property and of the reasonable probability of a [future change affecting value] . . . are questions of fact for the trier").
 "[B]ecause each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. D'Addario v. Commissioner of Transportation, 180 Conn. 355, 365, 429 A.2d 890 (1980); Slavitt v. Ives, 163 Conn. 198, 209, 303 A.2d 13
(1972); Moss v. New Haven Redevelopment Agency, 146 Conn. 421, 425-26, 151 A.2d 693 (1959)." French v. Clinton, 215 Conn. 197, 200-01, 575 A.2d 686 (1990). "In condemnation hearings, the state referee sitting as a court [of] appeals . . . is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. Birnbaum v. Ives, 163 Conn. 12, 21, 301 A.2d 262 (1972); see also Minicucci v. Commissioner ofCT Page 2193 Transportation, [supra, 211 Conn. 388]."fn11 (Internal quotation marks omitted.) Eichman v. JJ Building Co., 216 Conn. 443, 453, 582 A.2d 182
(1990).
Northeast Ct. Economic Alliance, Inc. v. ATC Partnership, 256 Conn. 813,828-30 (2001) (punctuation as in original).
"The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of damages to be awarded in eminent domain proceedings," Gray Line Bus Co. v. Greater BridgeportTransit District, 188 Conn. 417, 427-28, 449 A.2d 1036 (1982). In an eminent domain proceeding, our Supreme Court has held that "a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . based upon the basis of all the circumstances bearing upon value." French v. Clinton,215 Conn. 197, 202-03, 575 A.2d 686 (1990).
(b) Appropriate Methods of Valuation
There are three generally accepted approaches to estimate the value of real estate:
The Cost Approach. This is a method of valuing property derived from estimating the value of the land, adding to it the estimated replacement or reproduction costs of the improvements and deducting from that sum estimated depreciation. Both Mr. Amadon, the plaintiff's appraiser, and Mr. Nocera rejected the use of the cost approach for this project because of the age of the structures as well as the types of materials and construction methods which were used which would make identification of replacement cost estimates difficult and therefore less accurate. (Exhibits 46 and 246.)
The Sales Comparison Approach. In this method, the appraiser identifies actual market transactions of sales thought to be "comparable." These sales are analyzed and compared to the subject and adjustments are made for differences between the subject property and the specific sale. The reliability of this technique is dependent upon the degree of comparability of the actual sale including the time frame of the sale, the verification of the sales data and the absence of unusual circumstances which may have affected the price of the underlying comparable.
The Income Capitalization Approach or Income Approach. In this appraisal method, the anticipated future benefit; i.e., future cash flow is valued. This is, in effect, the sum of net anticipated rents less loss CT Page 2194 of interest until collection and anticipated capital appreciation. These factors are then discounted to determine the present economic value of the property.
Both appraisers rejected the replacement cost approach as being inappropriate. Mr. Amadon, plaintiffs' appraiser, also indicated that he believed the income capitalization approach was unreliable and not suited in this instance because he testified that there wasn't sufficient data availability concerning market rates and vacancy, A.T.C. collection loss added to the uncertainty with respect to this project, difficulty in estimating absorption rates and renovation costs. Mr. Nocera did do an income approach analysis. If for nothing else, this analysis is helpful in confirming the market valuation Mr. Nocera arrived at by using the comparable sales approach.
Even though Mr. Amadon's appraisal does indicate that there was not available sufficient information of a reliable nature to do a capitalization of income analysis, he did agree that a rental value of $2.50 and a cap rate of 10, were reasonable. He had available many of the facts and assumptions from the Master Action Plan.
Mr. Amadon opined that the Windham Mill property had no value. The cost to cure environmental hazards was, in his opinion, in excess of the value of the premises free and clear of environmental hazards. The value ascribed free and clear of those hazards was estimated to be $850,000.00 by Mr. Amadon.
Mr. Nocera ascribed a comparable sales valuation of the property of $2,508,000.00 and an income capitalization value of $2,582,000.00. To both he added $200,000.00 as the value of the existing hydro-dam leases arriving at a final estimated value, fair market value, of $2,700,000.00.
The evidence supports the contention of both appraisers that the replacement cost method of valuation is inappropriate. Accordingly, the court will not discuss further this approach.
The Income Approach or the Capitalization of Income Approach. The plaintiffs' appraiser, Dean Amadon, testified that the income approach was not appropriate for this parcel because the variables necessary in order to do an evaluation based upon this appraisal contain too many unknowns. Although Mr. Amadon accepted many projections and estimates set forth in the Master Action Plan, he apparently was unwilling to accept that information for the purpose of doing an income approach valuation. The Court believes that there was sufficient information in the Master Action CT Page 2195 Plan from which such an analysis could have been done. On the other hand, Robert Nocera, the defendant's appraiser did accept many of the assumptions set forth in the master plan particularly with respect to market demand, absorption rates and costs of renovation, demolition and remediation. But Mr. Nocera did not use the market rental projections of $2.25 per square foot set forth in the Master Action Plan and instead did his income approach valuation based upon $6.00 a square foot for the light industrial space and $10.00 a square foot for the office space. (Exhibit 246, p. 43.)
The court is not going to set forth an analysis of each of the claimed comparable leases set forth on pages 41 and 42 of Mr. Nocera's appraisal. However, because of the time differentials and because some of these properties are located in or near major metropolitan areas and major highways, the Court does not find these comparables persuasive for establishing the rental values which Mr. Nocera used as the basis for his capitalization of the income stream.
The Court then will use the comparable sales approach to valuation. In so doing, it does not consider that this is by default since the sales comparison approach is quite commonly used and, in fact, in the first trial of this matter, Judge Hammer discussed in some detail the appropriateness of using the comparable sales method. (See "Mem. Dec.," September 14, 1999, p. 20.) As noted by Judge Hammer, our Supreme Court has observed that "the best test for the determination of value is ordinarily that of market sales." Burritt Mutual Savings Bank v. NewBritain, 146 Conn. 669, 674 (1959). See also National Folding Box Co. v.New Haven, 146 Conn. 578, 580-81 (1959). In its opinion in this case, our Supreme Court indicated that the comparable sales method of valuation may be employed. Northeast Connecticut Economic Alliance, Inc. v. ATCPartnership, 256 Conn. 813 at 842, 776 A.2d 1068 (2001).
It goes without saying that the comparable sales approach has as its premise finding comparable sales. Sibley v. Middlefield, 143 Conn. 100,106-07 (1956). Since no two parcels of real estate are truly alike, adjustments must be made to the comparable sales in order to arrive at the fair market value of the parcel being appraised.
Plaintiffs' appraiser, Dean Amadon, chose four sales as his basis for comparison; one in Torrington, Connecticut, one in Southington, Connecticut, one in Meriden, Connecticut and one in New Haven, Connecticut. The Court did not find that in fact these "comparables" were indeed comparable to the subject property, or, if suitable for a basis for comparison, it is not clear that all adjustments needed to be made to make the sale comparable to the subject property were in fact made. For CT Page 2196 instance, two of the sales, the one in Torrington (Comparable Sale 1) and the one in Meriden (Comparable Sale 3) were both sales by lenders who had taken title by foreclosure. For Comparable 1, the mortgage granted by the selling financial institution was in an amount greater than the sales price of the property. As to parcel one, Mr. Amadon testified that there were some environmental problems and that they were addressed in the transaction. It is not clear if they were addressed in the sales price or in other ways on the amount of adjustment. Comparable Sale 2 also had environmental problems. There was no evidence as to the nature and extent of the problems nor indeed how they impacted on the price paid at the time of the sale. As the Supreme Court stated in this case, "if the comparable sales method of valuation is employed, the fair market value may be arrived at by (1) evidence of sales of uncontaminated comparable property, (2) discounted by some factor . . ." Id. at p. 842. It is clear that these "comparable" sales selected by Mr. Amadon were notuncontaminated. Among the adjustments made to the "comparable" sales for other physical characteristics (see pp. 55 and 56, Exhibit 46), it does not appear that any adjustments were made for the environmental issues. Lastly, Mr. Amadon concludes that the comparable value, on a gross square foot basis, is $0.77 per square foot. Because of the various considerations affecting each of the properties selected by Mr. Amadon, this valuation is suspect. Moreover, to apply a $0.77 per square foot figure to the 1,104,000 gross square feet of the project is meaningless since there was no evidence anywhere from any source indicating that the 1,104,000 square feet at this property was intended to be used for any purpose whatsoever. The Master Action Plan and both appraisals contemplated that a substantial amount of the square footage at the site would be demolished. For all of these reasons, the court rejects the valuations of Mr. Amadon.
The valuation and analysis set forth by the defendant's appraiser, Robert Nocera, is more persuasive. The court accepts the methodology set forth by Mr. Nocera. It does what the Supreme Court directed, namely, sets forth what the appraiser believes the fair value of the properties would be and then subtracts the cost of remediation, rehabilitation and repair (stabilization) in arriving at his values in a comparable sale method. It sets forth the estimated cost for the remediation, rehabilitation and repair (stabilization) on the basis that these costs are factors which would be considered in arriving at fair market value.
Of course, any buyer would ultimately have to determine how much space would be economically usable both from the point of view of cost and the amount of such light industrial/office space as could reasonably be expected to be rentable in the Willimantic area. CT Page 2197
Mr. Nocera assumed that the Mill 4 property could be either abandoned or gifted to a non-profit organization. That is to say that he ascribed no value to Mill 4 nor did he burden the property with any of the costs estimated for remediation. The court does not believe that a willing seller would sell the portion of the property which could be redeveloped and be left with 22.5 acres of property which, by virtually all accounts, has little current economic value and substantial environmental liability. Any purchaser of the site who was forced to accept the whole parcel; i.e., including Mill 4, would of course consider the liabilities of this property in arriving at a value that the purchaser would be willing to pay. Although there was some testimony that the property could be "mothballed," that is wait until some other opportunity came along to develop it or dispose of it, such a plan is speculative, and there is no evidence whatsoever from which the court could conclude that such a course would be acceptable to any reasonable seller.
From the court's inspection, it was clear that even eight years after the taking, some portions of the property, particularly in Mill 1, had further deteriorated. It is also clear that the photographs in evidence depict, not surprisingly, the worst wear and deterioration and that substantial portions of the site were not even, eight years later, in as derelict condition as the portions depicted by the plaintiff's exhibits. Some portions of the site had been fully rehabilitated, substantial demolition had occurred and there were some tenants on the site. The court obviously is considering only the condition of the property as it existed in 1994 and indicates the facts observed for the record but the detailed analysis of the condition, remediation, repair and rehabilitation is set forth from the testimony of the witnesses who were present on the site at the time of taking before and from the information set forth in the Master Action Plan.
(c) Determining Just Compensation
The Master Action Plan contemplated that the project would be approached in phases and considers the Mill 4 site to be "a special opportunity." The Plan contemplated that certain other buildings would be demolished and/or abandoned but others clearly would be reused and that large portions including particularly Mill 1 would be developed or demolished as circumstances would later develop. According to Section 7 of Exhibit 16, the Master Action Plan contemplates that 11 separately numbered buildings clearly will be preserved (see Table 11, page 51 and End Note 7), that eight buildings would be demolished and that two buildings, Building 11 (Mill 1) and Building 56, would be demolished or developed depending upon how circumstances played out. Mr. Amadon's report indicates (page 57) that 409,252 square feet of good space remains CT Page 2198 on the property while Mr. Nocera comes up with approximately 402,000 square feet. The court will assume that Building 56, containing almost 137,000 square feet, would be demolished because it does not appear reasonable that the market could absorb all of that space and that Building 11 (Mill 1), containing 86,000 square feet, would be either demolished or renovated. Mill 1 is historically significant being the oldest building on the site and constructed of the same riverbed granite as Mill 2 and many of the other buildings which are to be preserved. If that building is demolished, there will be substantial expenses incurred in connection with flood control, all of which will be discussed later.
The court determines that the proper square footage of the buildings to be preserved is 412,802 (although Table 11 indicates it is 412,804). Mr. Nocera determined that the fair market value of building(s) of this approximate size, configuration and characteristics "clean and stabilized" would have a fair market value of $25.00 per square foot. The court determines that that value is high and considers that Mr. Nocera's comparables 1 and 2 more appropriately indicate value both because they are larger in terms of square footage and because those sales are nearer in time to the time of taking. The other comparables are at least more than one year previous to the taking. The court will find that a reasonable value for the 412,802 square feet clean and stabilized would be $20.00 per square foot, for a gross valuation of $8,256,040.00. In order to end up with 412,802 square feet of clean and stabilized space, of course, the owner or developer would be required to incur substantial expenses, not only in environmental remediation and stabilization of the buildings to remain, but also in environmental and demolition costs with respect to the other buildings and the remainder of the site.
In calculating the costs and potential reimbursement for costs, the court has made certain assumptions and findings of fact as the basis for its decision.
1. A potential buyer would seek all sources of funds to reimburse or defray the environmental costs including investigation or remediation.
 a. The Connecticut State Bond Commission had approved $3 million for this project on October 22, 1993. (Exhibit 211.) Some of these funds had been expended by September of 1994, the time of taking, including approximately $200,000 for preliminary environmental site investigation, and the costs of the Earthtec investigation. (Exhibit 22.)
 b. American Thread had assumed liability for environmental cleanup to the extent required by the state DEP Form III (Exhibit 207) and, in CT Page 2199 1994, its successor company had sales of $3.4 billion and EBITDA earnings of $390 million and was paying a dividend.
2. No allowance is made for a so-called "soft cost." There was no evidence as to these costs and furthermore the projections set forth in the Master Action Plan assume a stream of rental income starting as early as the first year, which presumably would offset some of these costs.
3. The court did not ascribe certain of the so-called other costs; i.e., site improvements, to the project. (See e.g., Table 6 of the Master Action Plan.) Some of these costs are attributable to Mill 4 and are expressly taken into consideration. Others did not appear to be clearly specified to the extent that the court could determine their appropriateness. In ascribing a clean "value" of $20.00 per square foot, the court was being conservative, as it assumes a buyer would be, recognizing that even the identified estimated cost may not be 100% accurate. The $20.00 per square foot estimate is 20% lower than Mr. Nocera's opinion as to value. Additionally, the court assumed that some of the site improvements would be attributable to the Heritage Park amenities and a portion of the cost could be paid out of specific grants pertaining to the Heritage Park. Lastly, except as expressly noted, there was no offsetting allowance made for the recycling from buildings to be demolished; i.e., used brick, copper and the like. The Master Action Plan estimates "several hundred thousand" of possible recyclables from Mill 4. Likewise, it is reasonable to assume substantial funds could be realized from the buildings to be demolished.
4. Pursuant to Public Act 93-382, ATC and any other for-profit partnership, proprietorship or corporation would be permitted to seek state financial assistance for the "construction or rehabilitation of commercial, industrial and mixed use structures . . ."
5. The court assumed that 80% of the environmental remediation cost could be recovered from the $3,000,000.00 grant and from other potential sources including American Thread. The court did not accept a higher percentage recognizing that certain administrative costs would be incurred in connection with the obtaining and use of such grant money and, presumably, legal fees would be incurred in prosecuting any claim against American Thread.
The plaintiffs argue that the fact that government monies are available to defray some or all of the remediation costs should not inure to the benefit of the owner in a condemnation. The court rejects this argument. A non-governmental owner would be entitled to seek such reimbursement pursuant to Public Act 93-382. Furthermore, the plaintiffs assert that the CT Page 2200 court should not consider at all the potential right to reimbursement which the owner had under CERCLA and Connecticut General Statutes §22a-452. Obviously, these are rights which run with the land. In accordance with the public policy of both the state and federal government, those responsible for environmental pollution should not be absolved of responsibility merely by divesting themselves of the polluted property. These rights are part of the inherent rights of ownership in the land which were extinguished along with title in the condemnation. SeeWaste Management of Pennsylvania, Inc. v. City of York, 910 F. Sup. 1035,1043 (M.D.Pa. 1995), Chemical Waste Management, Inc. v. Armstrong WorldIndustries, Inc., 669 F. Sup. 1097 (E.D.Pa. 1987), and Slavitt v.Ives, 163 Conn. 198, 207 (1972).
The court relied principally upon Table 11 from pages 51 and 52 of Exhibit 16, but also relied on testimonial evidence, Exhibit 22 (remedial cost estimates from Earth-Tech) and other information contained in Exhibit 16.
The court determines fair market value at the time of taking to be $1,721,165.00 as follows:
Gross Value 412,802 square feet @ $20.00 $8,256,040.00
Building(s) Environmental Stabilization Demolition
7 Remaining[1]
lead paint and asbestos $ 965,300.00 $3,991,000.00
sitework 300,000.00
testing 142,000.00
Building 56 320,000.00
lead paint and asbestos 134,000.00
Mill 4
site (w/o cap)[2] 612,000.00 625,000.00[3]
lead paint and asbestos 267,500.00
Other Buildings[4] 525,000.00 CT Page 2201
lead and asbestos 275,300.00
Total — Excluding Building 1 $2,696,100.00
Est. reimbursem (2,156.800.00) 
unreimbursed environmental $ 539,300.00
Totals ($6,000,300.00) 539,300.00 3,991,000.00 1,470,000.00
Gross Value Less Environmental, Stabilization and Demolition = $2,255,740.00
Weatherproofing (150,000.00)
Building 1 Adjustment[5] (550,000.00) 
$1,555,740.00
Other adjustment to value
Hydro 200,000.00
Land Value — Mill 4[6] 375,000.00
$2,130,740.00
Contingencies[7] (409,575.00) 
Net — Fair Market Value, September 1, 1994 $1,721,165.00
(d) Interest
In addition to "Just Compensation," the defendants in this action are seeking interest pursuant to General Statutes § 37-3c. That interest is to be "at a rate that is reasonable and just on the amount of compensation awarded." Plaintiffs argue that such an award is to be merely compensatory and not punitive. They argue that if the 18% rate as sought by the defendants is awarded on that portion of the compensation award which reflects the amount of back taxes (which are accruing interest at 18%) it would be punitive, would amount to tax abatement and would not be reasonable and just.
Although the defendant offered some evidence as to the appropriate amount of interest including the cost of its money; i.e., mortgage, CT Page 2202 interest rate and back taxes, it appears to be asking for a further hearing to determine a reasonable and a just rate of interest. The defendant does persuasively argue that if a rate of interest of less than 18% is awarded on the amount of compensation which is equal to the amount of any back tax liability that the city will in effect achieve a windfall by recovering from the defendants 18% while paying out to the defendants on the money which it withheld some lesser sum. The plaintiffs assert that Judge Hammer's award of 10% should be left to stand because his judgment was closer [in time] to the facts, made for sound reasons and sound judicial policy. Curiously, the plaintiff does not argue that this issue was not subject to the appeal and therefore has been determined as between the parties, an argument they tried to make with respect to the valuation of the building itself. There could be merit to such an argument because it does not appear that this was raised in the Supreme Court, unlike the whole valuation issue which was set aside by the Supreme Court. At least as compelling to the court is the notion that the defendants are still contesting with the town the amount of the tax liability. They should not be put in a better position than any other taxpayer who challenges a tax assessment.
For the foregoing reasons, the court finds, as Judge Hammer found, that the 10% statutory rate is reasonable and just under all of the circumstances.
(e) General Statutes § 8-132
Pursuant to Public Act 00-89, General Statutes § 8-132 was amended to require that the court take evidence relevant to fair market value including evidence of the environmental condition and required remediation and requiring the court to "make a separate finding for remediation costs" for which the property owner would be entitled to a setoff in a pending or subsequent action to recover the remediation costs from the property owner. The Supreme Court elected not to make a determination as to whether or not Public Act 00-89 was intended to apply retroactively since, as a matter of law, the environmental contamination remediation costs had to be considered by the court. This leaves hanging the question as to whether, in this case, the court is required to make a separate finding of required remediation costs. The court believes that the findings previously made with respect to this issue are sufficient to satisfy the provisions of General Statues § 8-132 (c) if it applies.
Conclusion
The court concludes that just compensation to the defendants as of September 1, 1994 is the amount of $1,721,165.00. In addition, CT Page 2203 the defendants are entitled to interest at the rate of 10%, costs and statutory costs pursuant to General Statute § 8-133.
McLachlan, J.