JAMES D. GREENE ET AL. *v.* J. WILLIAM BURNS,
COMMISSIONER OF TRANSPORTATION
(14243)

SHEA, CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued February 14—decision released April 28, 1992

*Arnold Sbarge,* with whom, on the brief, was *Craig S. Taschner,* for the appellants (plaintiffs).

*Michael J. Lombardo,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (defendant).

CALLAHAN, J. The dispositive issue in this appeal from the judgment rendered in a condemnation action is whether the trial court properly valued real property of the plaintiffs that the state had taken by eminent domain. The defendant, the commissioner of transportation, condemned land belonging to the plaintiffs, James D. Greene, Patrick J. Crehan, Richard J. Fricke and James A. Canevari, and determined its value for purposes of condemnation. The plaintiffs

appealed to the Superior Court, claiming that the defendant had undervalued their property. The Superior Court disagreed with the plaintiffs, however, and concluded that the defendant had actually overvalued the plaintiffs' property. Thereafter, the plaintiffs appealed to the Appellate Court, and we transferred the case to this court pursuant to Practice Book § 4023. We affirm the judgment of the trial court.

The plaintiffs were the owners of undeveloped land located in Danbury and Ridgefield. The plaintiffs' land consisted of approximately twenty-four acres located in Danbury, which was zoned light industrial, and approximately twenty-nine acres located in Danbury and Ridgefield, which was zoned residential. On November 18, 1988, pursuant to General Statutes § 13-73 et seq., the defendant condemned the entire property for use in constructing a state highway, and estimated damages to the plaintiffs to be $2,194,000. The defendant deposited that sum with the court in accordance with General Statutes § 48-11,[1] and the

[1] General Statutes § 48-11 provides: "Whenever the state takes property under any provision of the general statutes or any special act, and the state and the owner or owners of such property or of any interest therein are unable to agree on the amount to be paid as just compensation for such property, the taking authority shall file, with the clerk of the court to which a petition for the assessment of just damages has been preferred, a statement of the sum of money estimated by such authority to be just compensation for the property or interest therein taken. Such sum shall be deposited in said court to the use of the person or persons entitled thereto and notice of such deposit shall be given to such person or persons by such clerk. The court may require such person or persons to give bond to the state conditioned on the repayment to the state of so much of such deposit which may be withdrawn as exceeds the amount of compensation finally awarded. Interest shall not be allowed in any judgment on so much of such amount as had been deposited in said court. Upon the application of any such owner or owners, the court, after determining the equity of the applicant in such deposit, may order that the money so deposited, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in such proceeding. If the compensation finally awarded exceeds the total amount of money so deposited or received by any person or persons entitled thereto, the court shall enter judgment against the state for the amount of the deficiency."

court subsequently paid that amount to the plaintiffs in November, 1988. Dissatisfied with the defendant's estimate, the plaintiffs appealed to the Superior Court, claiming that they had not been justly compensated for the taking of their property. Pursuant to General Statutes § 52-434a,[2] the matter was referred to a three member panel of state trial referees.

At trial, the plaintiffs offered evidence indicating that the highest and best use of the Danbury parcel was as a light industrial development. Vincent McDermott, who was qualified as an expert in the field of land use planning, testified for the plaintiffs. McDermott stated that he had headed a team of experts, hired by the plaintiffs, that had analyzed the development potential of the subject property. The team included John Thompson, a traffic consultant, John Scott, a real estate development consultant, and James MacBroom, a spe-

[2] General Statutes § 52-434a provides: "(a) In addition to the powers and jurisdiction granted to state referees under the provisions of section 52-434, a chief justice or judge of the supreme court, a judge of the appellate court, a judge of the superior court or a judge of the court of common pleas, who has ceased to hold office as justice or judge because of having retired and who has become a state referee and has been designated as a trial referee by the chief justice of the supreme court shall have and may exercise, with respect to any civil matter referred by the chief court administrator, the same powers and jurisdiction as does a judge of the court from which the proceedings were referred.

"(b) In condemnation proceedings in which the assessment fixed by the condemning authority exceeds the sum of two hundred thousand dollars the court may, at the request of either party, or on its own motion, refer the proceedings to the chief court administrator for referral to a committee of three such referees who, sitting together, shall hear and decide the matter. In such matters in which the fees payable to a referee are to be paid by the state, each such referee shall be reimbursed as provided in section 52-434.

"(c) The power conferred by this section may be exercised by any such state referee, whether acting in his capacity as a state referee, or as an auditor, or as a committee of one, or by any committee composed of not more than three such state referees, with respect to any civil matter referred to him or to it, the provisions of any general or special law to the contrary notwithstanding."

cialist in civil engineering and water resource engineering. The plaintiffs' team proposed construction on the Danbury parcel of a light industrial development consisting of two one-story buildings with a total floor area of approximately 300,000 square feet. There was testimony that such a development could be used for research laboratories, warehousing, light manufacturing facilities or corporate offices.

The plaintiffs offered further evidence tending to prove that it was feasible to construct the proposed development. McDermott testified that, in determining the feasibility of the project, the team had evaluated the property's topography, soils, potential for sewage disposal, potential for drainage and accessibility. Additionally, they had considered the zoning regulations that were applicable to the property.

MacBroom testified that he had investigated the capacity of the property to support the proposed development's projected sewage disposal, drainage and water supply facilities. MacBroom stated that the property contained a large amount of rock ledge that would have to be removed in order to install the industrial facilities, but that he believed that the ledge was an asset because the plaintiffs could sell the crushed rock for profit. MacBroom testified that, in his opinion, the property was suitable to sustain the required sewage disposal system and drainage facilities, and it could supply sufficient water to support the light industrial use of the property. MacBroom also stated that he believed that the plaintiffs could obtain the necessary approvals to construct the sewage, drainage and water supply systems.

Regarding access to the property for industrial use, Thompson testified that several of the surrounding roads, particularly Laurel Lane and Starrs Plain Road, would have to be extensively improved, but that such

improvement was possible, and he believed that all of the necessary approvals could be obtained to complete the project. McDermott further testified that it was his belief that all the permits required to construct the entire development could be obtained within a reasonable time. Regarding whether the development would be marketable, Scott testified that he had analyzed the real estate market to determine the potential demand for the proposed light industrial development. Scott concluded that, in 1988, there was a reasonable probability that there would be a significant demand for that type of facility.

As a result of the findings of the plaintiffs' team, McDermott concluded that, within a reasonable time and with economic feasibility, a light industrial development could be constructed on the Danbury parcel. On the basis of that conclusion, Ronald B. Glendinning, a real estate appraiser, determined that the highest and best use of the plaintiffs' Danbury parcel was light industrial. He concluded that the highest and best use of the remainder of the land was residential, and he appraised the value of the entire property at $4,409,000.

In contrast, the defendant offered evidence to indicate that the highest and best use of the entire parcel, including the Danbury parcel zoned for light industrial use, was residential. Ronald Ravizza, who was in the business of rock removal, questioned the plaintiffs' conclusion that the rock ledge on the property was an asset. Ravizza testified that, rather than selling excavated rock, he typically disposed of it. Although he conceded that it was possible that the rock could be crushed and sold or even used by the plaintiffs, Ravizza testified that, in his opinion, it would require considerable expense to remove the rock. Kenneth C. Stevens, a soil scientist, testified regarding the feasibility of constructing a sewage disposal system on the property. He stated

that tests he had performed on the property's soil demonstrated that it had "extremely rapid permeability." He concluded that, because of the presence of nearby wetlands, it would be difficult to design the large, on-site sewage disposal system that would be necessary to meet department of environmental protection specifications. Warren Herzig, a supervising sanitary engineer for the department of environmental protection, also testified that he did not believe that the property could adequately absorb the amount of sewage that would be produced by the plaintiffs' proposed industrial development. Amerigo Scarpa, president of a consulting engineering firm, testified that the cost of developing the Danbury parcel as the plaintiffs proposed would be extremely high. He also testified that Starrs Plain Road and Laurel Lane, the access roads to the parcel, would have to undergo very costly upgrading. Scarpa stated that, in his opinion, it was not economically feasible to develop the Danbury parcel as the plaintiffs had proposed because: (1) the costs were too high; (2) it was questionable whether the appropriate permits would be issued to improve the roads; and (3) it was uncertain whether the zoning commission would approve the sewage system.

The defendant also offered the testimony of two professional real estate appraisers, Arthur Oles and John Flint. Oles determined that it would be necessary to access the proposed development via Laurel Lane, which ran through a residential zone. He was aware that Danbury zoning regulations prohibited accessing an industrial zone through a residential zone. Accordingly, he determined that the highest and best use of the entire property was residential, and that it was 100 percent likely that the Danbury parcel could, and would, be rezoned as residential. In Oles' appraisal report, he stated, "given the residential character of the surrounding neighborhood, the likelihood of a zone change [of

the Danbury parcel] from IL-40 industrial to RA-80 residential is considered to be 100 percent." He also reported that "the subject property industrial acreage has no utility for industrial use. The highest and best use of this acreage is for single-family residential use, with the likelihood of a zone change to RA-80 residential considered to be 100 percent." Oles appraised the plaintiffs' property as having a value of $1,172,000.

Flint also concluded that the highest and best use of the entire subject property was residential. Flint testified that he believed that there was inadequate access to the property for industrial purposes and that the property could not support the sewage needs of an industrial use. Flint stated in his appraisal report that the highest and best use for the entire parcel was residential. He stated that his appraisal was contingent upon a zone change, which he believed would occur because the assistant city planner for Danbury had informed him that "there is a stronger possibility of gaining a residential zone change than developing the parcel for industrial use." Accordingly, Flint appraised the plaintiffs' property as residential and placed a value upon it of $1,143,000.

The trial court's memorandum of decision reveals the following findings. It would be more costly to remove the significant amount of bedrock from the plaintiffs' property than the plaintiffs estimated. Because the sewage system would cross wetlands and because the land was so highly permeable, it would be difficult and costly to install the proposed sewage system. The court also found that the unusual costs of preparing the site, those above and beyond the usual costs of development, would amount to $3,100,000, and the necessary costs of improving Laurel Lane and Starrs Plain Road would amount to $1,600,000, "which is far in excess of the plaintiffs' estimates." The court also found that the process of securing permits from Danbury, the state of

Connecticut, and the federal government for industrial development would be long and expensive. The court concluded that the "extremely high" costs of the project made "use of the premises for light industrial buildings unfeasible." The court stated that "[t]he proposed subdivision of the plaintiffs . . . has no reasonable probability of reaching fruition in the near future . . . ." Accordingly, the court concluded that the highest and best use of the entire property was residential, assessed the value of the land as $1,763,452 and ordered the plaintiffs to repay the state $430,548.

In this appeal, the plaintiffs claim that the trial court: (1) improperly valued the Danbury parcel as residential property because it was zoned light industrial; (2) improperly held the plaintiffs jointly and severally liable for payment of the judgment in favor of the defendant; and (3) improperly ordered the plaintiffs to post a bond to secure the judgment being appealed.[3]

I

The plaintiffs first claim that the trial court improperly concluded that the highest and best use of the Danbury parcel was residential and, therefore, incorrectly determined its value as residential property. The plaintiffs assert that the trial court's conclusion was improper because at the time of its taking the Danbury parcel was zoned industrial, and the trial court failed to find that it was reasonably probable that the zone would be changed to residential. Further, the plaintiffs argue that, even if the trial court found that it was reasonably likely that such a zone change would occur, that finding was not supported by the evidence. We disagree with both of the plaintiffs' contentions.

---

[3] Because we conclude, as the plaintiffs conceded at oral argument, that the claim that they were improperly ordered to post bond has become moot, we will not consider it.

" 'The owner of land taken by condemnation is entitled to be paid just compensation. . . .' " *Minicucci* v. *Commissioner of Transportation,* 211 Conn. 382, 384, 559 A.2d 216 (1989); Conn. Const., art. I, § 11. The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. *Minicucci* v. *Commissioner of Transportation,* supra; *Cappiello* v. *Commissioner of Transportation,* 203 Conn. 675, 681, 525 A.2d 1348 (1987); *Budney* v. *Ives,* 156 Conn. 83, 88, 239 A.2d 482 (1968). In determining market value, "it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . ." *Budney* v. *Ives,* supra. Because a change in zoning restrictions obviously could affect the price of real property, "where such a change is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair value" of the property. Id.; *Transportation Plaza Associates* v. *Powers,* 203 Conn. 364, 375, 525 A.2d 68 (1987). "[T]he true issue is, not the value of the property for the use which would be permitted if a change in zone was made, but the value of the property as zoned at the time of the taking as it is affected by the probability of a change." *Budney* v. *Ives,* supra, 89.

## A

Initially, the plaintiffs contend that the trial court failed to find that a change in the zone of the Danbury parcel from industrial to residential was reasonably probable. In the absence of such a finding, the plaintiffs assert that the trial court should have valued the parcel as industrial property. We conclude that the trial court implicitly found that such a zone change was reasonably probable.

Throughout its memorandum of decision the trial court recognized that, at the time of the taking, the Danbury parcel had been zoned industrial, and that the remainder of the subject property had been zoned residential. The trial court listed numerous reasons why the plaintiffs' proposed industrial development would be excessively costly to construct, and concluded that it was not feasible. The court also stated that it had considered the testimony of the real estate experts and had given such credibility to that testimony as the court had been convinced it deserved. One of those experts, Oles, had offered evidence to indicate that a zone change of the Danbury parcel from industrial to residential was 100 percent likely. Another expert, Flint, offered evidence that he believed that such a change would occur, as well. Although the court failed to refer explicitly to the probability of a zone change in its memorandum of decision, it stated therein that it valued all of the property, including the industrially zoned Danbury parcel, as residential.

Unquestionably, it would have been improper for the trial court to value the Danbury parcel as residential if it had found that the property would remain industrially zoned and, therefore, could not be legally used for residential purposes. This, the plaintiffs urge, underscores the magnitude of the trial court's error in valuing the Danbury parcel as residential without a finding that a change of zone was probable. A far more sensible view of the trial court's decision, however, is that it recognized that the plaintiffs' proposed industrial development was not feasible, accepted the testimony of Oles and Flint and concluded that it was reasonably probable that the zone would be changed to residential, but did not explicitly so state in the memorandum. Although Practice Book § 4059 provides that a memorandum of decision must state conclusions on each claim of law and also the factual bases for those conclusions,

we have held that it is not essential that each factor which may reasonably affect the value of property be "meticulously recited in the memorandum." *McDermott* v. *New Haven Redevelopment Agency,* 184 Conn. 444, 446, 440 A.2d 168 (1981). Our conclusion that the trial court implicitly found that a zoning change was reasonably probable "comports with our ordinary practice of reading an ambiguous trial court record so as to support, rather than contradict, its judgment. . . ." (Citation omitted.) *Lauer* v. *Zoning Commission,* 220 Conn. 455, 469–70, 600 A.2d 310 (1991). Moreover, to the extent that the plaintiffs believed that the trial court's memorandum of decision was unclear, they had an obligation to move the trial court for articulation, which they failed to do. Practice Book § 4051;[4] *McLaughlin* v. *Bronson,* 206 Conn. 267, 277–78, 537 A.2d 1004 (1988). Therefore, we conclude that the trial court's memorandum adequately expressed the court's finding that industrial development was not feasible and that a zone change to residential was reasonably probable.

[4] Practice Book § 4051 provides in relevant part: "A motion for rectification or articulation shall be filed in triplicate with the chief clerk of the supreme court and forwarded by such clerk to the trial judge. The trial judge shall file the ruling on the motion with the chief clerk of the supreme court.

"Any motion seeking corrections in the transcript or the trial court record which depend on proof of matters not of record or seeking an articulation or further articulation of the decision of the trial court shall be determined by the judge of the trial court whence the appeal is taken or the reservation is made. The trial court may make such corrections or additions as are necessary for the proper presentation of the preliminary statement of issues or for the proper presentation of questions reserved; or the trial court may approve a stipulation of counsel that such a correction or addition be made, provided the motion or stipulation is presented before the appeal is ready to be assigned for hearing and only by leave of the supreme court thereafter. The action of the trial judge as regards such a correction or addition may be reviewed by the supreme court under § 4054. . . ."

B

Next, the plaintiffs claim that even if the trial court found that a zone change was reasonably probable, the evidence offered was insufficient to support that finding. We are unpersuaded.

When making the difficult determination of whether a zone will be changed in the future, the trial court should cautiously examine the evidence offered. *Budney* v. *Ives,* supra, 90. The questions of the highest and best use of property and of the reasonable probability of a zone change are, however, questions of fact for the trier. *Stamford Apartments Co.* v. *Stamford,* 203 Conn. 586, 592, 525 A.2d 1327 (1987); *Transportation Plaza Associates* v. *Powers,* supra; *Levine* v. *Stamford,* 174 Conn. 234, 235, 386 A.2d 216 (1978); *Lynch* v. *West Hartford,* 167 Conn. 67, 74, 355 A.2d 42 (1974). We will not disturb the court's findings on those issues unless they are clearly erroneous. *Transportation Plaza Associates* v. *Powers,* supra, 378.

In its memorandum of decision, the court stated that the Danbury parcel could not feasibly support an industrial use. Its finding was based upon the evidence that it would be extraordinarily costly to: (1) remove the bedrock from the property; (2) install an effective sewage system; (3) upgrade the surrounding roads; and (4) obtain the necessary permits to complete the project. In addition, Oles and Flint, professional appraisers, offered their testimony regarding the probability of a zone change. Oles stated that he believed that a zone change of the Danbury parcel from industrial to residential was *100 percent* likely. Flint, having discussed the issue with the Danbury assistant town planner, reported that a zone change was more likely than the use of the Danbury parcel for industrial purposes. The plaintiffs offered no evidence to challenge

the opinions of Oles or Flint that a zone change was likely, and it was within the trial court's discretion to accept the testimony of the defendant's appraisers. *Stamford Apartments Co.* v. *Stamford,* supra; *Transportation Plaza Associates* v. *Powers,* supra, 377–78.

Although the plaintiffs assert that the defendant's proof was insufficient in part because they offered no testimony from voting members of the Danbury zoning commission, we have held that "[p]roof of the reasonable probability that land could be put to a particular use need not be established by the testimony of the particular administrative officials involved." *Transportation Plaza Associates* v. *Powers,* supra, 377. While it is true that "[w]ishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostications do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of a future change in zone," the trial court's decision in this case was firmly based on evidence in the record. *Budney* v. *Ives,* supra, 89–90; see *Heath* v. *Commissioner of Transportation,* 175 Conn. 384, 387–90, 398 A.2d 1192 (1978) (testimony of one appraiser, in conjunction with the observable industrial use in the vicinity was a sufficient basis upon which to find a reasonable probability of a zone change to industrial); *Lynch* v. *West Hartford,* supra, 74–75 (testimony of two appraisers, and the fact that the land was currently being used, without objection, for industrial purposes provided sufficient basis to conclude that a zone change to industrial was reasonably probable). The trial court's finding that the highest and best use of the Danbury parcel was residential was not clearly erroneous. *Transportation Plaza Associates* v. *Powers,* supra, 378.

## II

The plaintiffs next claim that the trial court improperly held that they were jointly and severally liable for

payment of the judgment against them. The plaintiffs assert that, because they held the property as tenants in common, they are liable for payment of the judgment only in proportion to their respective percentage interests in the property. We decline to decide the issue raised by the plaintiffs because the trial court did not, in fact, hold the plaintiffs jointly and severally liable.

In its memorandum of decision and in its written judgment, the trial court stated that the plaintiffs had been paid $430,548 in excess of the damage they sustained, and "[t]hey are ordered to repay that amount to the State of Connecticut." Subsequently, the plaintiffs moved the trial court to articulate whether the plaintiffs' liability was joint and several or only several. The trial court denied the motion for articulation, stating that, pursuant to General Statutes § 48-10,[5] its authority was "limited to the assessment of damages," and "[i]t has no authority to decide the issue of the respective liabilities of the plaintiffs to repay the state."

The plaintiffs state on appeal that, because the trial court denied their motion for articulation, they "shall assume the worst for purposes of this appeal, and consider the liability imposed by the judgment as joint and several . . . ." That assumption is in direct contradiction to the trial court's explicit statement that it could not decide the issue of the parties' respective liability for damages. Furthermore, the plaintiffs do not claim that the trial court improperly interpreted its jurisdiction as granted by § 48-10, or that it improperly refused to decide the issue of their respective liabilities. Because we will not render a purely advisory opinion, we decline the plaintiffs' invitation to "assume the worst," and, therefore, will not consider this issue further. *Moshier v. Goodnow,* 217 Conn. 303, 306, 586 A.2d 557 (1991);

---

[5] General Statutes § 48-10 provides: "The determination of the amount of damages in any case brought by the state to condemn land or any interest therein shall be referred to a state referee."

*Lehrer* v. *Davis,* 214 Conn. 232, 234–35, 571 A.2d 691 (1990); *Singh* v. *Singh,* 213 Conn. 637, 654, 569 A.2d 1112 (1990). If the plaintiffs are unable to agree with the defendant on their individual responsibility for repayment, that issue will have to be resolved in a separate action.

The judgment is affirmed.

In this opinion the other justices concurred.