DAVID S. EISENBERG, TRUSTEE, ET AL. *v.* ALMA TUCHMAN
(AC 25745)

Lavery, C. J., and McLachlan and Berdon, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued November 30, 2005—officially released March 21, 2006

*Charles A. DeLuca*, with whom were *John W. Roberts*, *Elizabeth L. Bates* and *Sarah F. DePanfilis*, certified legal intern, for the appellant (defendant).

*Miles F. McDonald*, with whom, on the brief, was *Joyce H. Young*, for the appellees (plaintiffs).

*Haden P. Gerrish*, with whom was *Fernando F. de Arango*, for the appellee (intervening plaintiff).

*Opinion*

LAVERY, C. J. The defendant, Alma Tuchman, appeals from the judgment of the trial court effecting an equitable partition of property held by the defendant as a tenant in common with the plaintiffs David S. Eisenberg and Lucy T. Eisenberg, trustees of the David Eisenberg and Lucy Eisenberg living trust, and Jessica T. Matthews.[1] The town of Greenwich (town) was permitted to intervene in this matter as a party plaintiff due to its agreement with the other plaintiffs to purchase whatever portion of the property they are awarded by virtue of this action.[2] The defendant claims on appeal that the court improperly (1) concluded that the highest and best use of a portion of the property was as a twelve lot subdivision, (2) valued that portion as if it were an approved subdivision, rather than on the basis of the probability of approval, (3) failed to allocate equitably open space on the property in proportion to the parties' respective interests and (4) denied the defendant's motion to dismiss for lack of subject matter jurisdiction over the town. We disagree with each of these claims and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to the issues on appeal. In a series of separate

---

[1] Tuchman, Lucy Eisenberg and Matthews are sisters.

[2] We use the term plaintiffs in this opinion to refer to the Eisenbergs and Matthews only.

inter vivos transfers[3] to them as tenants in common, the defendant, Lucy Eisenberg and Matthews received from their mother a 43.4 acre tract of land located in the Cos Cob section of Greenwich.[4] The property has been assessed for tax purposes as two separate parcels, one consisting of approximately eight acres on which there are several structures (parcel B), and the other consisting of the balance of the acreage, which is undeveloped (parcel A).[5] Parcel B lies roughly in the southwest quadrant of the entire tract. The structures on parcel B comprise a traditional country estate and include a main residence, a caretaker's cottage, a pool and poolhouse, a writer's cabin, stables and a riding ring. The defendant has resided in the main residence on the property for much of her life, while her sisters have lived elsewhere.

The property contains various wetlands and watercourses. Parcel A is bisected by Charles Brook, which runs north and south. Strickland Brook runs east and west across the southern part of parcel B, and meets Charles Brook in the southern portion of parcel A. The driveway that provides access to the structures on parcel B crosses Strickland Brook via a small bridge.

On October 6, 2000, the plaintiffs commenced this action seeking either an equitable partition of the prop-

---

[3] The transfers occurred in 1974, 1975 and 1982.

[4] At some later time, but prior to the commencement of this litigation, Lucy Eisenberg transferred her interest in the property to the David Eisenberg and Lucy Eisenberg living trust.

[5] A third tract of land owned by the plaintiffs and the defendant, referred to in the proceedings as parcel C, also was a subject of the partition action, but its disposition is not challenged on appeal. Parcel C is a small (approximately one fifth of an acre), landlocked, lakefront parcel, not contiguous to parcels A and B and surrounded by property formerly owned by relatives of the plaintiffs and the defendant. Parcel C's utility and value were greatly diminished when the surrounding property was purchased by the town and the lakefront became accessible to the general public. On appeal, we utilize the same designations to refer to the various parcels as did the trial court.

erty or a partition by sale. The defendant filed an answer and counterclaim in which she alleged that she had occupied and maintained the property for many years as her home, and requested a partition in kind.[6] By the time of trial, the plaintiffs and the defendant had agreed to stipulate that the requested partition would be in kind rather than by sale, and that the portion to be allocated to the defendant would include all of parcel B along with some portion of parcel A.[7]

On August 13, 2001, the town filed a motion to intervene and be made a party plaintiff in the matter. It claimed, inter alia, that it was a vendee under a recently executed contract with the plaintiffs to purchase their interest in the property following partition and, therefore, that it had a direct and personal interest in the proceeding that would be affected by the court's judgment. The plaintiffs consented to the proposed intervention, but the defendant was opposed. On May 23, 2002, the court overruled the defendant's objection and granted the town's motion to intervene. In a memorandum of decision addressing the motion, the court found that the town, by virtue of the contract to purchase, was vested with an equitable title in the property.[8] The court concluded that the town's equitable title was an interest sufficient to qualify it to intervene in the partition action as a matter of right. The town thereafter filed a second revised complaint enumerating all of the

[6] The defendant also raised two special defenses that are not at issue in this appeal.

[7] On September 13, 2001, the plaintiffs filed a request for leave to amend their prayer for relief such that it requested only an equitable partition. It does not appear that the request ever was formally granted by the court, although the corresponding stipulation clearly was accepted.

[8] For the purpose of deciding the motion to intervene, the court properly assumed that the allegations made therein were true. See *Washington Trust Co.* v. *Smith*, 241 Conn. 734, 746, 699 A.2d 73 (1997) ("The question on a petition to intervene is whether a well-pleaded defense or claim is asserted. Its merits are not to be determined. The defense or claim is assumed to be true on [a] motion to intervene, at least in the absence of sham, frivolity, and other similar objections." [Internal quotation marks omitted.]).

parties' interests in the property and requesting the same relief as did the plaintiffs in light of the parties' stipulation, that is, an equitable partition of the property.

In answering the town's complaint, the defendant raised several special defenses. Generally, those defenses questioned the validity of the town's interest in the property and whether it had the right to participate in the partition action. On February 18, 2004, the defendant filed a motion to dismiss, requesting that "the court dismiss this action [as to] the [p]laintiff [t]own of Greenwich because the court lacks subject matter jurisdiction over the [t]own of Greenwich." The defendant reiterated one of the claims she had alleged in her special defenses, namely, that the town had failed to adhere to a statute governing land acquisition by municipalities, thereby rendering void the authorization it had obtained to purchase the plaintiffs' interest in the property. Accordingly, the defendant argued, the town lacked standing to participate in the action.

A trial to the court was held primarily on seven days in March, 2004. At the outset of the trial, the court denied, without prejudice, the defendant's motion to dismiss. The plaintiffs and the defendant then presented evidence regarding differing, hypothetical development proposals purportedly showing the highest and best use of the property. Both the plaintiffs and the defendant considered the highest and best use of parcel A to be as a residential subdivision, although they differed substantially as to the details thereof. As to parcel B, the plaintiffs argued that the highest and best use was a more limited subdivision, while the defendant maintained it was as an intact estate property. There was testimony from various engineers and town officials regarding the viability of the proposals. In addition, several expert appraisers testified about reports they had prepared to establish the value of the property,

within the context of the development proposals, as a basis for determining a line of partition.

A substantial portion of the trial was directed toward an effort to answer the question of whether part, or all, of the property was located within the town's sewer benefit area, such that it potentially could be subdivided into lots smaller than would be required if septic systems were necessary. Further efforts were devoted to a determination of the town's zoning boundaries in relation to the property so that the requisite minimum lot sizes could be established. The trial judge visited the property for several hours on March 27, 2004, for a personal viewing of its features and topography.

Near the close of evidence on March 31, 2004, significant questions regarding development possibilities for the property remained unanswered. The zone and sewer boundaries had not been definitively established. Moreover, testimony had revealed that neither the plaintiffs nor the defendant had presented plans that exploited fully the potential use of parcel B, instead having assumed it should remain largely intact as an estate property.[9] Accordingly, the court suggested continuing the trial until May 11, 2004, so that the parties could develop revised plans exploring more extensive development of parcel B. Additionally, it directed that the revised plans should be drawn assuming that the entire property fell within the town's sewer benefit area[10] and proposed that the town prepare to stipulate as to that

[9] In particular, there were indications that certain town officials, when consulting with the plaintiffs regarding their proposed plans, opined that it might be possible to replace or widen the existing roadway and bridge into parcel B, but that the plaintiffs, for reasons unrelated to the viability of that approach, had not pursued development of a plan incorporating a new roadway and bridge. The defendant's initial plans reflected her position at trial that the highest and best use of parcel B was as an intact estate property.

[10] The defendant's initial plans had assumed sewer availability on parcel A, but the plaintiffs' initial plan did not.

matter. The parties also agreed to assume a certain zone boundary for the purpose of creating the revised plans.

Also on March 31, 2004, the court heard argument on the defendant's renewed motion to dismiss and, thereafter, orally denied that motion. The court reasoned that the statute cited by the defendant, which was claimed to invalidate the executory contract between the plaintiffs and the town, did not apply to the facts and circumstances of the case, but rather governed only municipal acquisitions of property via condemnation. The town, therefore, had an interest in the property by virtue of the contract such that its participation in the partition action was proper.

The trial resumed on May 11, 2004. At that time, the town's attorney made a binding concession that the entire property was within the sewer benefit area. The plaintiffs and the defendant then presented new plans in accordance with the court's earlier directive. The plaintiffs' revised plan, and the second of two alternate revised plans submitted by the defendant, showed a new road and bridge crossing into parcel B, and more extensive development of that parcel. The revised plans also showed subdivision of parcel A, based on the assumption that sewer connections were available. The plaintiffs' revised plan subdivided parcel A into twenty-five lots and parcel B into thirteen lots. The defendant's second revised plan subdivided parcel A into twenty-two lots and parcel B into twelve lots.[11] Both plans depicted some amount of unallocated, open space on each parcel. The plaintiffs' revised plan included a proposed line of partition around the development on parcel B, which had been expanded to include more

---

[11] Although the defendant submitted a revised plan showing more intensive development of parcel B, she maintained that the highest and best use of that parcel was as an intact estate and argued that a new road crossing Strickland Brook was not likely to be approved by the town's inland wetlands and watercourses agency.

acreage and was labeled "proposed parcel B."[12] Some of the previous witnesses were recalled to testify regarding the viability of the parties' revised plans.

On August 31, 2004, the court issued a comprehensive memorandum of decision. It provided an extensive overview of the case, describing the nature and topography of the property, the parties' initial and revised plans and the challenges raised as to those plans, and the various factors and constraints influencing any proposed development.[13] The court noted the parties' general agreement, as established by the testimony of their respective appraisers, as to the value of the proposed subdivision lots, namely, $775,000 for a one-half acre lot and $1 million for a full acre lot. It determined that the highest and best use for both parcel A and parcel B would be as residential subdivisions.

The court proceeded to analyze the parties' revised subdivision proposals and concluded that "the defendant's [second revised] plan more closely resembles a realistic approach for development of parcel A, while the plaintiffs' plan presents a better approach for the development of parcel B." The court rejected the defendant's argument that a new crossing of Strickland Brook and the adjacent wetlands would be disallowed by the town, concluding instead that it was "very likely" that the new subdivision road depicted on the revised plans to access parcel B would gain all necessary approvals.

Using the estimates generally agreed on by the testifying appraisers, the court assigned values to the indi-

---

[12] Neither of the defendant's revised plans included a proposed line of partition.

[13] Those factors and constraints included the town's zoning and subdivision regulations, the presence of wetlands and watercourses on the property and the regulations protecting them, the likelihood of obtaining approval to construct roads on the property, the availability of public sewers and the limitations imposed by the town's public works department on the dimensions of any proposed roads.

vidual lots shown within parcel A on the defendant's second revised plan and to those shown within parcel B on the plaintiffs' revised plan. Parcel A, as shown on the defendant's second revised plan, included eighteen one-half acre lots and four full acre lots; thus, the court found the lots in that parcel to have a total gross value of $17,950,000. The enlarged parcel B, as shown on the plaintiffs' plan, included eleven one-half acre lots and a one and one-half acre lot;[14] thus, the court found the lots in that parcel to have a total gross value of $9,525,000.[15] The court assigned a value of $100,000 to parcel C. See footnote 5. Aggregating the gross values of the three parcels, it found the total value of all of the property subject to partition to be $27,575,000. The court then awarded to the plaintiffs the reduced parcel A and parcel C, which together were valued at $18,050,000 or 65.5 percent of the total value, and it awarded to the defendant the expanded parcel B, which, at $9,525,000, amounted to 34.5 percent of the total value. Given "the slight difference between the award and an ideal [two-thirds/one-third] partition as well as the high value of the property awarded to each of the parties," the court concluded that an award of money damages to the plaintiffs to make the shares precisely proportionate was not warranted.

The court ordered that the property, excluding parcel C, be partitioned as shown on the plaintiffs' revised subdivision plan. The expanded parcel B as depicted on that plan consisted of 12.52 acres, and the remaining

[14] The court disregarded one of the lots shown on the plaintiffs' revised plan after concluding that it likely was unbuildable.

[15] The court did not assign any value to the existing structures on parcel B, crediting the testimony of the various appraisers that, although functional and habitable, they lacked significant worth. As to the one and one-half acre lot, the court valued it at $1 million because it was characterized by a substantial area of wetlands, which, the court assumed, did not contribute to the lot's value.

area, constituting a contracted parcel A, consisted of 30.74 acres.

Thereafter, the defendant filed a motion for articulation of the court's decision. See Practice Book § 66-5. In that motion, the defendant requested, inter alia, "that the court articulate the amount of 'open space' allocated to the plaintiffs [and] the basis on which such allocation was made . . . ."

In an articulation dated November 24, 2004, the court responded that it "did not allocate 'open space,' as such, to either the plaintiffs or to the defendant." It reiterated its findings that the highest and best uses of both parcel A and parcel B were as residential subdivisions, and explained anew that it considered most feasible the defendant's proposed subdivision as to parcel A and the plaintiffs' proposed subdivision as to parcel B. The court stated that it "allotted approximately 4.5 acres from 'parcel A' to 'parcel B,' the eight acre tract already set aside for the defendant by the stipulation of the parties," resulting in an expanded parcel B comprised of 12.52 acres, subdividable into twelve lots with a gross valuation of $9,525,000. According to the court, "[i]f both the plaintiffs and the defendant subdivided the property awarded to them [as contemplated by the revised plans], the plaintiffs' subdivision would include approximately fourteen acres of open space, and the defendant's subdivision would include approximately 4.5 acres of open space," both amounts which were more than sufficient to satisfy a 15 percent open space requirement in the town's subdivision regulations.

The court described the location of the theoretical open space allocated to the plaintiffs and what portions of it constituted wetlands or sloped areas, as opposed to flat, dry areas. It explained that, given that topography, had it allocated more of parcel A to the defendant, it would "have allowed for the creation of additional

subdivision lots and given her a disproportionate share of the total value of the property." The court illustrated its point with a hypothetical example showing that allocation of an additional one and one-half acres to the defendant would result in her receiving 38 percent of the total value of the property. In short, the court drew the partition line where it did "[i]n order to preserve the two-thirds, one-third balance between the value of the two tracts . . . ."

The court noted further that it had considered the possibility of including valuation of the open space as part of its analysis, but neither party had submitted any evidence regarding the value of excess open space in the context of a residential subdivision. It explained that it had pondered using a per acre figure provided by an expert in the context of an estate parcel, but ultimately concluded that, given the features of the land at issue, the "excess open space added little to the value of either share . . . ." Accordingly, the court "did not include the value of excess open space in its final analysis." This appeal followed.

Before turning to the issues on appeal, we discuss briefly the general law relating to partition of real property and the standard governing our review of the court's decision. "The right to partition has long been regarded as an absolute right, and the difficulty involved in partitioning property and the inconvenience to other tenants are not grounds for denying the remedy. No person can be compelled to remain the owner with another of real estate, not even if he become[s] such by his own act; every owner is entitled to the fullest enjoyment of his property, and that can come only through an ownership free from dictation by others as to the manner in which it may be exercised. Therefore the law afford[s] to every owner with another relief by way of partition . . . ." (Internal quotation marks omitted.) *Fernandes* v. *Rodriguez*, 255 Conn. 47, 55–56, 761

A.2d 1283 (2000); see also 7 R. Powell, Real Property (2005) § 50.07 [3] [a] ("right to partition is an inherent element of the tenancy in common, designed to prevent a forced continuation of shared ownership of property").

To effectuate the foregoing principle, "[General Statutes §] 52-495 gives discretionary authority to courts of equitable jurisdiction to order, upon the complaint of any interested person, the physical partition of any real estate held by tenants in common . . . . An action for partition at common law was equitable in nature, requiring courts to examine all relevant circumstances. . . . The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *Kubish* v. *Zega*, 61 Conn. App. 608, 614–15, 767 A.2d 148, cert. denied, 255 Conn. 949, 769 A.2d 62 (2001).

Consequently, we review the court's partition decision for an abuse of discretion. Id., 615. "In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . Our review of a trial court's exercise of the . . . discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) Id. The court's judgment "will be interfered with only where the partition has been made on wrong principles, or where a clear mistake has been made, or where there is great and evident unfairness or inequality in the division. In other words, substantial injustice or inequality must clearly appear, and it must be more than can be fairly accounted for by mere difference of judgment or opinion." 68 C.J.S. 123, Partition § 137 (b) (1998). Guided by this overarching standard, we turn to the claims on appeal.

## I

The defendant claims first that the court improperly found that the highest and best use of parcel B was as a twelve lot residential subdivision. Specifically, she contests the court's underlying finding that the proposed road and bridge to provide access to that subdivision likely would gain the requisite approval from the town's various land use agencies, in particular its inland wetlands and watercourses agency (wetlands agency). We do not agree.

"A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value. . . . [U]nder the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best [use] of the land. . . . A property's highest and best use is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Citations omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 25, 807 A.2d 955 (2002).

When determining the highest and best use of property, a court must consider whether there is a "reasonable probability" that the property could be put to that use. *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 25, 861 A.2d 473 (2004); cf. 68 C.J.S. 117, supra, § 133 (b) (in valuing land to be partitioned, "judge can properly consider the uses to which the property might be applied or to which it is reasonably adapted"). Similarly, when the feasibility of a proposed highest and best use of property is dependent on obtaining some action from a land use agency, if that action "is reasonably probable and not merely a remote or speculative possibility, the probability may

properly be considered in the determination of the fair value of the property." (Internal quotation marks omitted.) *Greene* v. *Burns*, 221 Conn. 736, 745, 607 A.2d 402 (1992).

The question of a property's highest and best use is a factual one for the trier, as is the issue of the probability of a particular land use agency action. *West Haven* v. *Norback*, 263 Conn. 155, 175, 819 A.2d 235 (2003). Accordingly, on appeal, we review the court's findings in this regard for clear error. Id. Nevertheless, we are mindful that forecasts of the actions of land use agencies "must be carefully scrutinized as it is difficult to project what a public body will decide in any given matter." *Delfino* v. *Vealencis*, 181 Conn. 533, 542, 436 A.2d 27 (1980).

To reiterate, the court, in adopting the plaintiffs' proposed subdivision plan for parcel B as that parcel's highest and best use, found that it was "very likely" that the new road and bridge crossing necessary to provide access to the subdivision would gain all of the requisite approvals from the town. In so finding, the court reasoned that "[t]he present bridge abutments and surrounding fill serve to significantly restrict the width of Strickland Brook and the adjacent wetlands [and that] [t]he construction of a new subdivision road would allow the abandonment of the present crossing, the restoration of the impacted wetlands and the construction of a crossing engineered to minimize the impact on wetlands and areas prone to flooding." After our careful review of the entire record, we are convinced that the court's findings have evidentiary support and, thus, are not clearly erroneous. In particular, it is apparent that the court, in concluding that the road and bridge were feasible, relied on the testimony of two of the plaintiffs' witnesses and the surrounding factual circumstances.

In their case-in-chief, the plaintiffs presented the testimony of Aubrey Mead, Jr., a civil engineer who, along with various town officials, had assisted in the development of the plaintiffs' proposed subdivision plans. In discussing his qualifications, Mead confirmed that he had appeared before the town's land use agencies, including the wetlands agency, on many occasions. He also lived within one-half mile of the property and had witnessed severe flooding of Strickland Brook,[16] and, further, was a member of the town's flood erosion control board. In response to questioning by the court, Mead noted that during development of the plaintiffs' initial subdivision plan, there had been discussions about creating a new bridge crossing the brook and wetlands into parcel B. He explained that, although a new crossing would have a wetlands impact, the impact could be mitigated by creating wetlands in other places and removing the existing bridge, which created a hydraulic restriction. Mead described the resultant trade-off for a new crossing as improvement of the flood plain and reduced flood elevation levels.

The court also heard testimony from Mark Massoud, director of the town's wetlands agency. When he first testified, Massoud discussed a meeting between town officials and the plaintiffs regarding the plaintiffs' first proposed subdivision plan. He recalled that one of the scenarios discussed was replacement of the existing bridge into parcel B with an improved one. Massoud confirmed that in some cases, water flow could be improved by replacing an existing bridge with one with a greater span or more solid foundation. He testified further that at times, wetlands permits were granted with offsetting remediation requirements and that the

---

[16] There was additional evidence of flooding in the area of the existing bridge crossing, particularly, the testimony of Wayne Paessler, a caretaker employed by the defendant, who resided on the property. Moreover, as noted in its opinion, the court witnessed flooding when it visited the property.

approval process could involve a "balancing act" of various pros and cons.

Mead returned to testify again after preparation of the parties' revised plans showing more intensive development of parcel B, along with replacement of the existing bridge and roadway. In support of the plaintiffs' revised plan, Mead testified that although the bridge construction required work within a floodway, the town's zoning regulations allowed for such work. He noted that the current bridge was "pretty restrictive [and that the] approach would be to put [in] another bridge somewhat wider than the existing one and higher so we could lower the water levels." When asked whether he thought that the wetlands agency would approve a new crossing of the wetlands as shown on the plaintiffs' revised plan, Mead replied that such was "a reasonable thing to propose [with] a reasonable chance of success."

Massoud also returned to testify about the revised subdivision plan and was asked to opine whether the wetlands agency would approve the wetlands crossing over parcel B as shown on the plaintiffs' revised plan. In reply, he stated that he thought there was "a reasonable, greater than 50 percent probability" that the crossing would be approved. Upon further questioning, Massoud reiterated his belief that such a crossing would have a better than even chance of approval.

In *Greene* v. *Burns*, supra, 221 Conn. 748–49, our Supreme Court upheld the trial court's finding that the highest and best use of a particular property was as a residential subdivision even though, at the time of trial, the property was zoned light industrial. The Supreme Court rejected the plaintiffs' claim that the evidence presented was insufficient to support the trial court's underlying finding that a zone change was reasonably likely to occur, concluding instead that the testimony of

two real estate appraisers that the change was probable, along with certain facts suggesting that the change would make sense, provided adequate evidentiary support. Id. The court was not convinced that testimony from the local zoning commission members was necessary to establish the likelihood of a change. Id., 749. The Supreme Court cited prior cases in which the testimony of appraisers, accompanied by factual situations indicating that a zone change would be logical, was held adequate to support findings that such zone changes were reasonably likely to occur. Id.

In the present matter, the court relied on the testimony of two individuals who were well qualified to assess the likelihood of the wetlands agency approving a particular project, namely, the director of that agency and a civil engineer with expertise in flood control who appeared before that agency frequently. That testimony was bolstered by a factual scenario of a problematic status quo, namely, an inadequate bridge that contributed to undesirable flooding. There was potential for that situation to be remedied by construction of a new, improved bridge and roadway that also would allow for more intensive development of parcel B. Given the testimony and other evidence of the surrounding circumstances, we cannot say that the court's finding that the highest and best use of parcel B was as a residential subdivision was clearly erroneous.

The defendant argues that the court instead should have credited the testimony of former town planner James Sandy, who believed that a wetlands crossing into parcel B would not be approved in light of the town's inability to show that a crossing of similar length had been approved in the last five or six years.[17] However, "[i]t is basic to our jurisprudence that credibility

---

[17] In response to a subpoena requesting records of approvals of crossings of similar length, Massoud was unable to produce any such evidence.

determinations are within the exclusive province of the court." *Ress* v. *Suffield*, 80 Conn. App. 630, 633, 836 A.2d 475 (2003), cert. denied, 267 Conn. 920, 841 A.2d 1191 (2004). "[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial [judge] is privileged to adopt whatever testimony he reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Bay Hill Construction, Inc.* v. *Waterbury*, 75 Conn. App. 832, 838, 818 A.2d 83 (2003). The court, thus, was entitled to find the testimony of Mead and Massoud to be the most credible, and we may not revisit its determination. Furthermore, we cannot fault the court for concluding, in light of that testimony, that although permits for lengthy wetlands crossings were not routinely granted by the wetlands agency, the opportunity to remedy an existing flooding situation rendered approval of the particular crossing at issue a reasonably probable event.

We note in conclusion that *any* proposed development of the property involved multiple uncertainties, and the court in determining the highest and best use essentially was charged with a complex predictive exercise within the constraints of incomplete and contrary information. As the defendant's counsel acknowledged when cross-examining Mead, every plan introduced and considered at trial raised wetlands issues, and a developer pursuing any of those plans would have to go before the wetlands agency and secure approvals. The court's finding as to highest and best use cannot be disturbed unless it is founded on "[w]ishful thinking, optimistic conjecture, speculation, rumor [or] unfounded prognostications" (internal quotation marks omitted); *Greene* v. *Burns,* supra, 221 Conn. 749;

which is not the case here. On the basis of the foregoing analysis, the defendant's first claim of error fails.

## II

The defendant claims next that the court improperly valued parcel B as if it were an approved subdivision, rather than on the basis of the probability that such a subdivision would be approved. We disagree.

"Valuation is a matter of fact to be determined by the trier's independent judgment. . . . In actions requiring . . . a valuation of property, the trial court is charged with the duty of making an independent valuation of the property involved. . . . [N]o one method of valuation is controlling and . . . the [court] may select the one most appropriate in the case before [it]. . . . Moreover, a variety of factors may be considered by the trial court in assessing the value of such property." (Citation omitted; internal quotation marks omitted.) *Route 188, LLC* v. *Middlebury*, 93 Conn. App. 120, 124, 887 A.2d 958 (2006).

"[T]he trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has broad discretion in reaching such conclusion, and [its] determination is reviewable only if [it] misapplies or gives an improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) Id.

The defendant's claim is that the court misapplied the law when it valued parcel B by aggregating the values assigned by the appraisers to each hypothetical subdivision lot on that parcel, where those values consisted of estimated amounts for which the lots, once approved, could be sold. According to the defendant,

the court should have discounted the values to account for the possibility that the wetlands crossing providing access to parcel B would not be approved. In support of this argument, the defendant cites a number of condemnation cases articulating the principle that, when a court values land for which it has found a zone change is reasonably likely to occur, "the true issue is, not the value of the property for the use which would be permitted if a change in zone was made, *but the value of the property as zoned at the time of the taking as it is affected by the probability of a change.*" (Emphasis added.) *Budney* v. *Ives*, 156 Conn. 83, 89, 239 A.2d 482 (1968); see also *Lynch* v. *West Hartford*, 167 Conn. 67, 74, 355 A.2d 42 (1974) ("trier must determine the value of the property as zoned on the taking date, taking into account the likelihood of a zone change, and not as if the property had already been rezoned"). Applying this concept to the facts of the present matter, the defendant argues, in essence, that the court overvalued parcel B by treating it as if it already were an approved subdivision rather than raw land with the mere potential to gain subdivision approval. We are not persuaded.

Although the valuation concepts and methods used in condemnation cases frequently are employed in other types of disputes in which the value of real estate is at issue, such as partition actions, we decline to extend the rule cited by the defendant as a mandatory requirement for valuations outside of the eminent domain context. When property is condemned, a governmental body is required to reimburse the property owner with just compensation, measured by "the market value of the condemned property when put to its highest and best use *at the time of the taking.*" (Emphasis in original; internal quotation marks omitted.) *Gasparri* v. *Dept. of Transportation*, 37 Conn. App. 126, 128, 655 A.2d 268 (1995). Because public funds are used to compensate the condemnee, it is important that the value

of the property not be overinflated so as to amount to a windfall to its owner. Accordingly, in that context, a discount is appropriate to arrive at a present day value and to adjust for uncertainties. In an equitable partition action, however, public funds are not at issue, and valuation is performed only as a means of determining proportionate shares of the subject property. In short, the considerations underlying eminent domain law differ in important ways from those implicated in partition actions, and we decline to import wholesale the methodologies used in the former into the latter.

Given the foregoing, we cannot conclude that the valuation method employed by the court was an inappropriate one. Although the defendant's focus in making this argument is on parcel B, we note that the court used the same methodology to value parcel A as it did to value parcel B, and it is clear that the viability of the subdivision proposals as to each parcel was subject to some degree of uncertainty. Thus, to the extent that the valuations were inaccurate, they were similarly so.[18] Consequently, it is difficult to see how any lack of discounting resulted in an unfair determination as to the proportionate shares of the plaintiffs and the defendant. We conclude that the court did not abuse its discretion in valuing the properties as if they were approved subdivisions.

[18] Although the defendant claims that "the development of parcel B is far more speculative and risky than the development of parcel A," and, thus, presumably, the latter would be assigned a lesser discount factor, that assertion is not wholly convincing. Rather, the evidence adduced at trial indicates that multiple agency approvals would be necessary for any of the proposed developments on the property.

Additionally, as for a methodology for discounting the lot values provided by the expert appraisers, the defendant suggests that the court should have "quantif[ied] the percentage probability of approval" and, we assume, applied that percentage to the gross lot values. She does not elaborate, however, as to how the court should have deduced such percentage probability in the absence of any expert testimony in that regard.

## III

The defendant's third claim is that the court, in partitioning the property, improperly failed to allocate the "open space" in proportion to the plaintiffs' and defendant's respective interests. This claim lacks merit.

As previously explained, the court, when partitioning the property, allocated the proposed subdivision lots, on the basis of their value, to effect a one-third/two-thirds division thereof. It did not attempt to allocate the hypothetical open space surrounding the lots, as shown on the applicable subdivision plan, other than to ensure that each postpartition parcel included enough such space to satisfy the town's zoning regulations if the proposed subdivision plans actually were pursued.[19] In the end, the defendant was allocated slightly more than one third of the total value, but slightly less than one third of the total acreage.[20] The court explained in its articulation that, had it allocated more of parcel A's acreage to parcel B, the defendant would have received a disproportionately high percentage of the property's total value. It noted additionally the lack of evidence as to the value of open space in a residential subdivision.

It is obvious that the subdivision lots and the open space as depicted on the applicable plan are merely *theoretical* lots and space. In reality, all of the property at issue in this matter, with the exception of that occupied by the existing structures, consists of "open space." Accordingly, we construe the defendant's challenge as what it is, namely, a claim that she should have

---

[19] There is no indication from the record that the defendant actually intends to pursue development of parcel B as a residential subdivision. Rather, she testified that she did not plan to sell or subdivide the property, but would continue to maintain it as, essentially, conservation land. The town indicated that it would use the portion of the property it acquired from the plaintiffs for public recreational purposes.

[20] The defendant received 34.5 percent of the property's value and approximately 29 percent of its acreage.

received an additional portion of the property's area, which portion she identifies as approximately 1.7 acres. We disagree with this claim.

As previously noted, we review the end result in an equitable partition action for an abuse of the court's discretion. *Kubish* v. *Zega*, supra, 61 Conn. App. 615. Regarding the desired outcome, "a partition in kind . . . result[s] in a physical division of the land according to the parties' respective interests." *Delfino* v. *Vealencis*, supra, 181 Conn. 543 n.13. The goal of a court in a partition action is to "make the portions of the parties just and equal" with a "focus on *value* or quality, *not quantity*."[21] (Emphasis added; internal quotation marks omitted.) 68 C.J.S. 117, supra, § 133 (b). Because the defendant does not contest the court's assessment that she received 34.5 percent of the value of the property, an amount in excess of the one third to which she was entitled, her claim necessarily fails.[22]

Furthermore, although several appraisers were retained to prepare reports and testify at trial, none of the parties introduced any evidence regarding the value of open space in the context of a residential subdivision,

[21] The defendant did not object to the court's statement, near the outset of the trial, that "all [it] has to do is make sure that the plaintiffs' share is twice as valuable as the defendant's," nor to Lucy Eisenberg's explanation, while testifying, that what the parties sought was a "divi[sion] of the property in such a way that [the plaintiffs] receive two thirds of the value of the property and [the defendant] receive[s] one third of the value of the property."

[22] To the extent that the defendant is arguing that she should have received particular portions of the property aside from those encompassed by the stipulation, we note that a cotenant, in seeking partition of the common estate, "has no right to demand any particular part thereof." *Ianotti* v. *Ciccio*, 219 Conn. 36, 43, 591 A.2d 797 (1991). Similarly, when the property to be partitioned consists of separate and distinct parcels or tracts, no party has a right to insist that his share be allotted to him wholly out of one of those parcels or tracts; i.e., "[t]he owners are not entitled to a share of each property, but only to an equal share of the whole." 68 C.J.S. 120, supra, § 133 (e).

which made it difficult for the court to account for that space when determining an appropriate line of partition. Although it considered different approaches, the court ultimately decided that "the excess open space added little to the value of either share" and declined to include it in the analysis. "When faced with the constraints of incomplete information, a court cannot be faulted for fashioning an award as equitably as possible under the circumstances." *Commissioner of Transportation* v. *Larobina*, 92 Conn. App. 15, 32, 882 A.2d 1265, cert. denied, 276 Conn. 931, 889 A.2d 816 (2005).

Finally, although an equitable partition may have been accomplished in a number of different ways, the court's leeway in this case was constrained to a certain degree by the parties' stipulation, which required all of parcel B to be awarded to the defendant. As noted by the court during trial, its task in deciding this partition action was to "do the best it can to do justice in a complex fact situation." It recognized that the case was not an easy one. The court observed further that partition "would be an easier task if it were not for the fact that by the stipulation the parties have entered into, that is, that parcel B is not in play, that we have locked ourselves into this situation. This property would be infinitely easier to divide if it were not for that." The court's judgment was not made on wrong principles, nor does it demonstrate evident unfairness or substantial injustice. See 68 C.J.S. 123, supra, § 137 (b). Consequently, there is no abuse of discretion.

## IV

The defendant claims last that the court improperly denied her motion to dismiss for lack of subject matter jurisdiction over the town. She argues that, by operation of General Statutes § 48-6 (a), the contract between the town and the plaintiffs was void at the time of trial

such that the town lacked an interest in the property. The defendant claims, therefore, that the town lacked standing to file its intervening complaint and the court thus lacked jurisdiction to decide it.[23] We disagree.

The defendant's claim requires us to construe the meaning and applicability of § 48-6 (a) and, therefore, our review is plenary. See *Robinson* v. *Gailno*, 275 Conn. 290, 297, 880 A.2d 127 (2005). In addition, because the defendant's motion to dismiss questioned the court's jurisdiction, the same standard of review applies. "A challenge to the jurisdiction of the court presents a question of law. . . . Our review of the court's legal conclusion is, therefore, plenary." (Internal quotation marks omitted.) *Rock Rimmon Grange # 142, Inc.* v. *Bible Speaks Ministries, Inc.*, 92 Conn. App. 410, 413, 885 A.2d 768 (2005).

"The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z; see also *Robinson* v. *Gailno*, supra, 275 Conn. 298.

Section § 48-6 (a) provides that "[a]ny municipal corporation having the right to purchase real property for

---

[23] It is not clear what the defendant sought to accomplish by having the town's intervening complaint dismissed, insofar as if that complaint were dismissed, the identical complaint filed by the plaintiffs would remain. Although the defendant suggests that the granting of her motion necessarily would have barred the town from participating in the case, that suggestion is misguided. A party, to be permitted to intervene in an action, need not possess the standing necessary to bring that action itself. See *Franco* v. *East Shore Development, Inc.*, 271 Conn. 623, 858 A.2d 703 (2004). As previously noted, the court, prior to trial, overruled the defendant's objection to the town's motion to intervene, and the defendant does not challenge that ruling on appeal.

its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real property, within the corporate limits of such municipal corporation, and if such municipal corporation cannot agree with any owner upon the amount to be paid for any real property thus taken, it shall proceed in the manner provided by section 48-12 within six months after such vote or such vote shall be void." We note that General Statutes § 48-12 describes the procedure for governmental condemnation of land, "if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken," and includes a reference to § 48-6.

The following additional facts are relevant. The town was permitted to intervene in this matter by virtue of a contract dated June 4, 2001, between the plaintiffs, as sellers, and the town, as purchaser. Pursuant to the contract, the town agreed to purchase whatever portions of the property were awarded to the plaintiffs in the partition action. According to the defendant, the town gained authorization to make this purchase by a vote of its planning and zoning commission at a meeting held on January 27, 2000.[24] Trial in this matter commenced on March 18, 2004, at which time the court initially denied, without prejudice, the defendant's motion to dismiss. It denied the renewed motion on May 11, 2004.

The defendant argues that the court improperly denied the motion because at the time the town and the plaintiffs executed their contract, more than six months had elapsed since the commission's vote

---

[24] The plaintiffs contest that assertion, claiming instead that the purchase was not authorized until it gained approval by a vote of the town's board of estimate and taxation on May 21, 2001. Because the court found General Statutes § 48-6 (a) wholly inapplicable, it did not make any factual findings in this regard.

authorizing the purchase. She asserts, in short, that the time limit established by § 48-6 (a) applies to arms length transactions resulting in the transfer of property to municipalities as well as to takings by condemnation. The defendant claims, therefore, that the contract was executed without valid authorization and thus is void. We are not persuaded.

The defendant in advancing this claim focuses on the word "acquire" in the initial clause of § 48-6 (a), which grants municipalities the power to "take or acquire . . . real property" once an authorizing vote occurs. It is the latter clause of § 48-6 (a), however, that contains the six month time limitation. Although that clause references a related statutory provision governing condemnation procedure, contemplates nonagreement with a property owner as to the amount of payment[25] and states explicitly its applicability to "real property thus *taken*" (emphasis added) General Statutes § 48-6 (a); the defendant in support of her argument advances a tortured statutory interpretation analysis in an attempt to convince us that the time limitation in the latter clause applies to voluntary sales as well as to imposed takings. To accept that argument effectively would require us to ignore the plain language of the clause. Moreover, although not dispositive of the matter, we observe further that the provision at issue falls squarely within chapter 835, title 48 of the General Statutes, which concerns eminent domain, and has its origins in legislation entitled, "An Act Concerning Taking of Land by Municipalities." See *State* v. *State Employees' Review Board*, 239 Conn. 638, 649, 687 A.2d 134 (title of legislation indicative of underlying intent). We conclude that the plain language of § 48-6 (a), read within the context of related statutes, directs only that condemnation pro-

---

[25] The defendant refers to her failure to agree on a sales price for her portion of the property. It is, however, the plaintiffs' share that the town has contracted to purchase. There is no indication in the record that the town ever contemplated taking any portion of the property by eminent domain.

ceedings, if ultimately necessary to attain privately owned real property sought by a municipality for public purposes, commence within six months of municipal authorization for the taking. Conversely, that time limit does not apply to sales voluntarily negotiated between property owners and municipalities.

"It has been stated that all persons having an interest in the land are necessary parties in a suit for partition, and must be joined either as plaintiffs or defendants." 68 C.J.S. 77, supra, § 72 (a). "[P]arties [who should be joined in a partition proceeding] may include . . . a contract purchaser of one cotenant's undivided interest . . . ." 7 R. Powell, supra, § 50.07 [3] [e]. On the basis of the foregoing reasoning, we conclude that the court properly denied the defendant's motion to dismiss because the town, which had an interest in the property by virtue of an executory contract whose validity was not affected by operation of § 48-6 (a), was a proper party to this action.

The judgment is affirmed.

In this opinion the other judges concurred.